[No. A107227. First Dist., Div. Two. Jan. 10, 2006.]

THE CITY AND COUNTY OF SAN FRANCISCO et al., Plaintiffs and Appellants, v.
THOMAS O. BALLARD, Defendant and Respondent.

[No. A108569. First Dist., Div. Two. Jan. 10, 2006.]

THOMAS O. BALLARD, Cross-complainant and Appellant, v.
THE CITY AND COUNTY OF SAN FRANCISCO et al., Cross-defendants and Respondents.

382

## COUNSEL

Niall Vignoles for Plaintiffs and Appellants and for Cross-defendants and Respondents.

Brian J. McCauley for Defendant and Respondent and for Cross-complainant and Appellant.

## OPINION

**LAMBDEN, J.**—The City and County of San Francisco and the People, by and through the City Attorney for the City and County of San Francisco (collectively, city), filed a complaint against Thomas O. Ballard. City alleged, among other things, that the 84-unit brick and wood-frame building owned by Ballard (the building) was a public nuisance because its partial sprinkler system was not in compliance with the fire prevention statutes for high-rise structures (Health & Saf. Code, § 13210 et seq.).[1] City asserted that the building was a high-rise and must have an automatic fire sprinkler system throughout the structure (full sprinklers or complete sprinkler system). Ballard filed a countercomplaint for declaratory relief and also claimed city had violated his state and federal civil rights.

Prior to trial, the court sustained without leave to amend city's demurrer to Ballard's claims of state and federal civil rights violations. City's claims and Ballard's cross-claims for declaratory relief proceeded to a court trial. After listening to all of the evidence, the trial court ruled that laches barred city's claims. The court further found that, even if the lawsuit were not barred by the equitable defense of laches, the building is not an existing high-rise, and therefore does not have to maintain full sprinklers. Further, the court found the statute of limitations barred city's claims and that a partial sprinkler system complied with the law.

Following the trial, Ballard requested attorney fees as the prevailing party pursuant to section 17980.7, subdivision (c)(11). He also requested sanctions for discovery abuse. The trial court awarded Ballard attorney fees and imposed sanctions against city for failing to provide two documents and for failing to disclose the existence of these documents in Ballard's request for admissions.

City appealed the judgment and the court's rulings on attorney fees and discovery sanctions. Ballard appealed the dismissal of his counterclaim for state and federal civil rights violations. We consolidated these appeals.

---

[1] All further unspecified code sections refer to the Health and Safety Code.

We reject Ballard's challenges to the dismissal of his civil rights claims. With regard to city's appeal, we hold that the lower court erred in applying laches against city because its enforcement action involves a public safety issue. We still affirm the ruling against city, however, on the basis that the building does not qualify as a high-rise and is therefore not subject to the fire prevention requirements for high-rise structures. We reverse the trial court's award of attorney fees under section 17980.7, subdivision (c)(11), because we hold that this statute only applies to receivership proceedings, which did not occur in the present case. Finally, we conclude the trial court acted within its discretion when imposing sanctions against city for discovery abuse. We therefore reverse the award of attorney fees and affirm the judgment in all other respects.

## BACKGROUND

In 1987, Ballard purchased the building located at 1369 Hyde Street.[2] It is an 84-unit brick and wood-frame building (Type III-N construction), which was constructed in approximately 1907. On Hyde Street, there are three places of entry to the first floor of the building. Above the Hyde Street floor, are floors two through seven. Directly below the Hyde Street floor is the mezzanine floor; below the mezzanine floor is a partial basement. All of the floors except the basement have apartments. The basement has two doors with street access onto Washington Street.

The measurement of the building from the first floor (Hyde Street level) to the highest occupied floor (the seventh or penthouse floor) is approximately 68 feet. The measurement from the mezzanine level to the penthouse floor exceeds 75 feet. The height of the building from the top of the basement floor to the penthouse floor is approximately 92 feet.

In 1973, the Legislature created in sections 13210 through 13217 requirements for fire prevention in new and existing high-rise structures and for enforcement, inspections, and penalties for violations. Section 13210 defines high-rise structures as follows: "(a) 'Existing high-rise structure' means a high-rise structure, the construction of which is commenced or completed prior to July 1, 1974. [¶] (b) 'High-rise structure' means every building of any type of construction or occupancy having floors used for human occupancy located more than 75 feet above the lowest floor level having building access, except buildings used as hospitals . . . ."

█ The State Fire Marshal adopted regulations, which were originally found at title 24 California Administrative Code, section 2-1733 through

---

[2] Ballard testified that he transferred the property in 1995 to another unidentified entity in which Ballard holds some unspecified ownership interest.

section 2-1747, and relocated in the 1990's with essentially the same language to the California Building Standards Code, section 403.11 et seq. These regulations apply to high-rise buildings as defined by section 13210. California Building Standards Code section 403.11.1, subdivision (a)(2)(A) defines "building access" by stating that it "shall mean an exterior door opening conforming" to four listed elements, including "suitable and available for fire department use." (See also former Cal. Code Regs., tit. 24, § 2-1733.) This regulation at section 403.11.1, subdivision (a)(2)(B) also provides that, if the elevation of the exterior door opening is more than two feet above the adjacent ground level, then the measurement to the highest floor used for human occupancy shall be taken from the floor surface of the story or basement immediately below (two-foot rule).

The Note to California Building Standards Code section 403.11.1 explains: "It is the intent of this section that, in determining the level from which the highest occupied floor is to be measured, the enforcement agency should exercise reasonable judgment, including consideration of overall accessibility to the building by fire department personnel and vehicular equipment. When a building is situated on sloping terrain and there is building access on more than one level, the enforcing agency may select the level which provides the most logical and adequate fire department access."

In 1976, Chapter 4 of the National Fire Protection Association Standard 13 (NFPA Standard 13) specified the requirements for the spacing, location, and position of sprinklers. Section 4-1.1.1 delineated the basic principles for providing proper protection, which included: "(1) Sprinklers installed throughout the premises, including basements, lofts and all of the locations herein specified." Section 4-1.2 stated that when a partial sprinkler system has been installed, "the requirements of this standard shall be used insofar as they are applicable. The authority having jurisdiction shall be consulted in each case."

Section 13211 authorizes the State Fire Marshal to "prepare and adopt building standards relating to fire and panic safety in high-rise structures" and to establish "minimum standards for the prevention of fire and for the protection of life and property against fire and panic in high-rise structures." Section 13213, subdivision (a) directs that "[b]uilding standards and other regulations of the State Fire Marshal applicable to existing high-rise structures shall provide to the greatest feasible extent for the safety of occupants of the high-rise structure and persons involved in fire suppression activities. All existing high-rise structures shall be conformed to the requirements contained in such building standards and such other regulations on or before April 26, 1979."

█ Section 13217 provides that the local fire department may annually inspect all high-rise structures for compliance with building standards and

other regulations. "If the local fire department elects not to conduct an inspection, the State Fire Marshal shall conduct the inspection." (§ 13217, subd. (a).) Section 13233 requires the owner of any privately owned high-rise structure to certify annually that the appropriate local fire enforcing agency has been requested to conduct an inspection of the building to determine its conformance with all applicable high-rise structure fire safety standards. "The certification shall be submitted by letter to the State Fire Marshal." (§ 13233.)

After the effective date of the foregoing legislation, city classified the building as an existing high-rise, which the owner of the building at that time did not challenge. The city's agents suggested in 1978 that the owner of the building apply for a certificate of occupancy, which the owner did. The application described the building as being wood beam construction and with eight floors of occupancy. City issued the then owner of the building a certificate of final completion and occupancy.

As a result of the classification of the building as an existing high-rise, city required the owner of the building in 1979 to install further sprinkler systems, particularly on the penthouse or seventh floor. City inspected and approved all of the work and certified that the building was in full conformity with all applicable requirements. The permit application was filed in early 1979, but the final approvals did not occur until early 1983. City granted approval with this admonition: "[A]pproval is not intended to signify that the building is in compliance with all applicable state and local health and safety regulations. [City] reserves the right to enforce all Health and Safety Laws applicable to the . . . building now in effect or as may be enacted or amended in the future."

After the work was completed, the building contained a partial sprinkler system in its halls, basement, machine and storage areas, trash chute, and certain of its mezzanine units. Specifically, the owner installed six sprinklers off a penthouse hallway to protect a secondary exit path for a unit that did not otherwise have a secondary exit. The owner also installed one sprinkler to protect the alcove at the Washington Street access point. The building therefore had sprinklers to protect the common areas and 13 of its 84 units. The building also had a fire warning and remote alarm system.

Since 1983, the physical characteristics of the building have remained the same. The 1987 edition of NPFA Standard 13 specified the spacing, location, and position of sprinklers in Chapter 4. Section 4-1.1 set forth the basic requirements. Section 4-1.1.1 provided the following: "The basic requirements for spacing, location, and position of sprinklers are specified in this chapter and are based on the following principles: [¶] (a) Sprinklers installed

throughout the premises, . . ." The provision regarding partial sprinkler systems in section 4-1.2 remained the same as the one set forth in 1977.

In 1987, Chief Joseph Medina and Captain Charles Farrell, both from the city's fire department, interpreted the applicable versions of NFPA Standard 13 as mandating complete sprinklers in existing high-rise buildings. Building Standards Code section 403.11.1 provides that "the provisions of Sections 403.11.1 through 403.25 shall apply to every existing high-rise building." Building Standards Code section 403.24 states that "every existing high-rise building of . . . Type III-N . . . construction shall be provided with an approved automatic sprinkler system conforming to NFPA-13."

Consequently, after Ballard purchased the building in 1987, city's fire department demanded full sprinklers—that is, sprinklers in every unit and room. Ballard responded by requesting that the building be characterized as not a high-rise structure. The parties engaged in extended discussions and exchanges about whether the building was a high-rise from about May 1987 to March 1989. The annual high-rise inspections continued through 1989. From approximately June 1989 until the summer of 1996, no inspections of the building as a high-rise occurred, although those annual inspections were required by law for all high-rise buildings.

The 1996 version of NPFA Standard 13 added a section on the level of protection provided by the sprinkler system. Chapter 1 concerned general information. Section 1-6.1 provided, "A building, where protected by an automatic sprinkler system installation, shall be provided with sprinklers in all areas." Following this provision is the following in italics: *"Exception: Where specific sections of this standard permit the omission of sprinklers."* Section 1-6.2 stated the following: "When partial sprinkler systems are installed, the requirements of this standard shall be used insofar as they are applicable. The authority having jurisdiction shall be consulted in each case." Chapter 4 still concerned installation requirements, and section 4-1 set forth the basic requirements. Section 4-1.1 reads as follows: "The requirements for spacing, location, and position of sprinklers are based on the following principles: [¶] (a) Sprinklers installed throughout the premises, . . ." There was no provision regarding partial sprinkler systems in Chapter 4.

City filed a complaint against Ballard for injunctive and other relief on September 28, 2001; subsequently, it filed a first amended complaint on March 21, 2002. City alleged a claim for public nuisance for violating section 17920.3 of the State Housing Law (§ 17910 et seq.), a claim for public nuisance for violating the San Francisco Building Code, and a claim for public nuisance for violating Civil Code sections 3479 and 3480. It alleged in its

fourth cause of action on behalf of the People of the State of California an action for unfair business practices.

City alleged in its first amended complaint that the building was a high-rise and it did not have a complete sprinkler system, in violation of the regulations. In addition, it alleged that the building did not have sealed vertical shafts to prevent the spread of fire and smoke, and did not have appropriate fire escapes. Besides requesting an injunction, city requested the court to appoint a receiver to manage the property and to abate the violations. City asked for an award of attorney fees pursuant to section 17980.7, subdivision (d)(1), and Civil Code section 3496.

On April 11, 2002, Ballard filed a cross-complaint for declaratory relief and for alleged violations of his state and federal civil rights. On June 12, 2002, the trial court sustained without leave to amend city's demurrer to the civil rights cause of action. Ballard appeals from this ruling.

City's action and Ballard's declaratory relief claims proceeded to a court trial in early September 2003. The court found that city's claims were barred by laches and the statute of limitations. It also found that the building was not a high-rise and therefore not subject to the complete sprinkler system requirement. Finally, it determined that a partial sprinkler system complied with the regulations. Subsequently, Ballard moved for attorney fees pursuant to section 17980.7, subdivision (c), and posttrial sanctions for discovery abuse, which the trial court granted. City appeals from the judgment and from the postjudgment rulings.

We consolidated the appeals of city and Ballard. We granted city's request for judicial notice of various codes and ordinances and took under submission its request for judicial notice of rent board bulletins and demographic research studies. We take judicial notice of rent board bulletins but, as explained further in part I.B., *post*, the demographic research studies are irrelevant because we conclude that the building is not a high-rise.

## DISCUSSION

### I. *City's Appeal*

The lower court found that city's claims were barred by the equitable doctrine of laches. In addition, in response to Ballard's cross-complaint for declaratory relief, the trial court ruled that the building was not a high-rise

and therefore it did not need to comply with the high-rise statutes. City challenges both of these rulings.[3]

## A. *Applying Laches to a Public Entity*

City argues that the equitable doctrine of laches cannot be used to bar government enforcement of important life-safety regulations. (See, e.g., *Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 316 [96 Cal.Rptr.2d 747, 1 P.3d 63] (*Kajima*).) Although we review a court's application of laches under a deferential standard of review, the question of whether laches can be used against a public agency is a question of law, and " 'we are not bound by evidence on the question presented below or by the lower court's interpretation.' " (*Id.* at p. 315.)

■ As city acknowledges, courts have in particular situations applied the doctrine of laches against a public entity. (E.g., *City and County of San Francisco v. Pacello* (1978) 85 Cal.App.3d 637 [149 Cal.Rptr. 705]; *People v. Department of Housing & Community Dev.* (1975) 45 Cal.App.3d 185 [119 Cal.Rptr. 266] (*Department of Housing*).) "When the government is a party, invocation of either . . . laches or estoppel . . . rests upon the belief that government should be held to a standard of 'rectangular rectitude' in dealing with its citizens." (*Department of Housing, supra,* at p. 196.) "Decisions involving estoppel [or laches] against government feature judicial attempts at a synthesis between conflicting claims of private injustice and public interest." (*Ibid.*) It has long been held that the doctrine of estoppel or the doctrine of laches may apply to a government body if "a grave injustice would be done if estoppel were not applied, and it did not appear that use of the doctrine would defeat any strong public policy or result in the indirect enforcement of an illegal contract." (*County of San Diego v. Cal. Water etc. Co.* (1947) 30 Cal.2d 817, 826 [186 P.2d 124].)

The court in *Department of Housing* considered whether to apply the defense of laches against a government entity. (*Department of Housing, supra,* 45 Cal.App.3d at pp. 196–198.) It first examined the test used when applying equitable estoppel against a public entity, which is as follows: " 'The government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite to such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient

---

[3] City also contends the trial court erred in ruling that a partial sprinkler system satisfied NFPA Standard 13 and in finding the statute of limitations barred its claims. We need not address these findings since we are affirming on the grounds that the building is not a high-rise and therefore not subject to the high-rise fire prevention statutes and regulations.

dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel.' " (*Id.* at pp. 196–197, citing *City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 496–497 [91 Cal.Rptr. 23, 476 P.2d 423].)

The court in *Department of Housing* used the foregoing equitable estoppel test when deciding whether to apply the defense of laches. (*Department of Housing, supra,* 45 Cal.App.3d at pp. 196–198.) In *Department of Housing,* the private party had received a mobilehome park construction permit and the state agency had not made a written determination whether the proposal had significant environmental impact as required under the Environmental Quality Act. (45 Cal.App.3d at pp. 194–195.) The Court of Appeal held that laches barred the rescission of the permit where the applicant had waited four months to determine if an environmental inquiry would be required and had expended $40,000 after having received the permit. (*Id.* at pp. 197–198.)

The court in *Department of Housing* explained the basis for applying laches in the situation before it: "Here the state, represented by one agency, received written legal advice describing its environmental responsibilities; the applicant citizen received a permit on the assumption that the agency had met its responsibilities; on the strength of that assumption he commenced his project, incurring substantial expenses and losses over a period of months; only then did the state, acting through another agent, seek judicial action to annul what it had once granted; the citizen's losses are largely irrecoverable; the project is one which conformed with local land use regulations at its inception, hence not recognizable as a gross despoliation of the environment. The state's failure to commence its suit before the citizen incurred heavy loss created an injustice which outweighs any adverse effect of the state's failure to make timely environmental inquiries. We sustain the defense of laches." (*Department of Housing, supra,* 45 Cal.App.3d at p. 200.)

City maintains that *Department of Housing* is inapplicable because the situation in that case, unlike the present situation, did not involve a life-safety public nuisance. Our Supreme Court has clarified that equitable remedies such as estoppel and laches cannot apply when their application would nullify a public policy. (*Kajima, supra,* 23 Cal.4th at p. 316.)

In *Kajima,* our Supreme Court considered whether bid preparation costs and lost profits could be recovered against a public entity under the doctrine of equitable estoppel. (*Kajima, supra,* 23 Cal.4th at pp. 315–317.) The Supreme Court noted that "the competitive bidding statutes are ' "enacted for the benefit of property holders and taxpayers, and not for the benefit or enrichment of bidders, and should be so construed and administered as to accomplish such purpose fairly and reasonably with sole reference to the

public interest." ' " (*Id.* at pp. 316–317.) It therefore rejected the equitable remedy because "it is clear 'that neither the doctrine of estoppel nor any other equitable principle may be invoked against a governmental body where it would operate to defeat the effective operation of a policy adopted to protect the public.' " (*Id.* at p. 316.)

In the present case, the trial court found that requiring Ballard to install full sprinklers would cost a significant amount of money because much of these costs could not be passed onto the tenants due to rent ordinances. It further ruled there was little evidence to establish full sprinklers were that much better than partial sprinklers. When considering the policy of full sprinklers, the court found that they must not be that necessary because in 1979 the city considered partial sprinklers adequate protection. In addition, NFPA Standard 13, section 1-6.2 provides: "When partial sprinkler systems are installed the requirements of this standard shall be used insofar as they are applicable." The court stated, "If [city] had really judged life safety to be endangered, and that was the paramount consideration, it never would have approved partial sprinklers as satisfying the requirements for existing high-rises, it never would have ceased making annual inspections of the building for many years and it would not [have] waited until 2001 to initiate this action. The conclusion the court draws from considering all of the evidence on life safety and the effect which full sprinklering would have on life safety is that the increment is indeterminate, and [city] has not proven that it is any more than marginal."

█ It is not our role to determine whether a partial or a complete sprinkler system is necessary for adequate fire protection.[4] Rather, we must consider whether an enforcement action challenging a party's compliance with fire protection statutes and regulations constitutes a policy directed towards protecting the public. There is no doubt that fire hazards and the prevention of them is a policy adopted to protect the public. (See *City of Bakersfield v. Miller* (1966) 64 Cal.2d 93, 100 [48 Cal.Rptr. 889, 410 P.2d

---

[4] Whether a partial sprinkler system is adequate is not for the courts to decide. Indeed, the evidence was essentially undisputed and few could argue to the contrary that a complete sprinkler system is safer than a partial sprinkler system. Chief Massetani testified that sprinklers in all areas of a building "[s]ave lives and property. . . . They are on call 24/7. They are quick response heads that can mitigate fires in simplest stage, prevent them . . . from overtaking the sprinkler system." A sprinkler system limited to the communal hallways is less safe than complete sprinklers, because with hallway sprinklers "you are trying to provide an open egress for residents to exit the building. That does not stop the fire from spreading from floor to floor or auto exposure out the window up to the next floor if the fire started in the room itself and/or kitchen area." Massetani explained the benefit of complete sprinklers: "Normal combustible materials in a fully sprinklered building, the sprinkler head would be fused at the small stage of a fire and would contain and/or extinguish a fire at that time and without letting it expand." Even Ballard conceded that full sprinklers are safer than partial sprinklers.

393] [fire hazard is a nuisance and therefore city has power to define by statute standard by which courts are to judge whether nuisance exists].)

Ballard argues that it is undisputed that in 1979 the building complied with the fire regulations as they were then interpreted. He also argues that NFPA Standard 13 allows partial sprinkler systems when they have been inspected and approved by the local enforcing agency and the new interpretation cannot now be applied against him. City responds that Building Standards Code section 403.24 does not call for existing high-rises to conform to the 1976 NFPA Standard 13, but rather to the current NFPA Standard 13, and it claims the new standard requires full sprinklers.

The foregoing issues, however, relate to the merits of city's lawsuit and are immaterial to whether the trial court properly applied the defense of laches against city's attempt to enforce regulations regarding fire safety. We are concerned with whether city's lawsuit concerns a public policy and therefore, as a matter of law, laches is not available as a defense. We hold that fire safety is clearly a public policy concern and laches cannot bar city's claims that the partial sprinkler system in the building violated the fire prevention regulations for high-rise structures and thus constituted a public nuisance.

B. *High-rise*

The trial court found that an independent reason for rejecting city's claims of public nuisance was that the fire prevention regulations for high-rise structures did not apply because the building did not meet the criteria of a high-rise building. Section 13210, subdivision (b) defines a " '[h]igh-rise structure' [as] every building of any type of construction or occupancy having floors used for human occupancy located more than 75 feet above the lowest floor level having building access, except buildings used as hospitals, as defined in Section 1250." The trial court ruled that the measurement to determine whether the building is a high-rise should be from the Hyde Street entrance and that this measurement is less than 75 feet. It therefore concluded that the building was not a high-rise under the statute.

It is undisputed that the building has three doors of entry on Hyde Street, which is the first floor of the building. It is also undisputed that the mezzanine is directly below the first level and the basement is below the mezzanine. The basement has two doors entering Washington Street. It is undisputed that the measurement of the building exceeds 75 feet from either the basement or mezzanine floor. Thus, the building is a high-rise unless the measurement should be from the first floor on Hyde Street and that measurement falls below 75 feet.

Section 13210 provides that the measurement should be from the "the lowest floor level having building access" and city contends the trial court

erred when it considered "building access" to be from the first floor on Hyde Street. Further, even if the measurement is from Hyde Street, city argues that the measurement should have been from the mezzanine floor under the two-foot rule. We consider each of these arguments.

1. *Standard of Review*

We review the interpretation of the statutes de novo. The factual issues related to the measurement of the building from various points of entry are reviewed under the standard of substantial evidence. " 'When a finding of fact is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact. [Citations.] [¶] When two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court.' " (*Scott v. Common Council* (1996) 44 Cal.App.4th 684, 689 [52 Cal.Rptr.2d 161], quoting *Green Trees Enterprises, Inc. v. Palm Springs Alpine Estates, Inc.* (1967) 66 Cal.2d 782, 784–785 [59 Cal.Rptr. 141, 427 P.2d 805].) The testimony of a single credible witness may constitute substantial evidence. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [122 Cal.Rptr. 79, 536 P.2d 479].)

2. *Interpreting "Building Access"*

As already set forth, section 13210, subdivision (b) defines a high-rise building as "having floors used for human occupancy located more than 75 feet above the lowest floor level having building access . . . ." City maintains that under the clear language of the statute the measurement must be from the basement level on Washington Street, since it is the lowest floor in the building with building access.

The trial court found that the State Fire Marshal's regulations applicable to existing high-rises provide that the enforcement agency has discretion to determine the lowest floor level having building access. The Note to California Building Standards Code section 403.11.1 states that the enforcing agency has discretion to use its reasonable judgment to determine the level from which the highest occupied floor is to be measured and it is to consider "overall accessibility to the building by fire department personnel and vehicular equipment." The Note further provides that when the building, such as the one at issue here, is on a sloping terrain and there is building access on more than one level, "the enforcing agency may select the level which provides the most logical and adequate fire department access."

City maintains that the foregoing Note contradicts the express language of subdivision (b) of section 13210, which defines a high-rise building as one that

has "floors used for human occupancy located more than 75 feet above the lowest floor level having building access . . . ." According to city, under the clear language of this statute, the basement is the lowest floor level having building access and the extent to which these administrative regulations attempt to enlarge the terms of the enabling statute, they are invalid. (See, e.g., *Duskin v. State Board of Dry Cleaners* (1962) 58 Cal.2d 155, 165 [23 Cal.Rptr. 404, 373 P.2d 468].) "In the absence of valid statutory authority, an administrative agency may not, under the guise of a regulation, substitute its judgment for that of the Legislature." (*Harris v. Alcoholic Bev. Etc. Appeals Bd.* (1964) 228 Cal.App.2d 1, 6 [39 Cal.Rptr. 192]; see also Gov. Code, § 11342.2; *Pulaski v. Occupational Safety & Health Stds. Bd.* (1999) 75 Cal.App.4th 1315, 1341 [90 Cal.Rptr.2d 54]; *Morris v. Williams* (1967) 67 Cal.2d 733, 748 [63 Cal.Rptr. 689, 433 P.2d 697].)

We disagree that the statute's definition of high-rise is unambiguous. Section 13210 specifies that a high-rise structure is measured by the distance between the level of the highest occupied floor and the "lowest floor level having building access." The lowest floor level having building access could mean the lowest floor where one can enter or the lowest floor where it is reasonable to enter or where the fire department is likely to enter. Under city's interpretation, even when the basement door is so narrow or so small that it would not provide access to the fire department, it would be considered the level having building access. Indeed, building access is possible on a floor that has no door, simply a window, and the statute could be interpreted to measure from a floor with a window that provides "building access." Further, the statute is silent regarding situations similar to the one here where the building is on sloping terrain. Thus, we hold that "lowest floor level having building access" is ambiguous and, consequently, the interpretative Note to California Building Standards Code section 403.11.1 is not inconsistent or contrary to the statute.

 Further, the Legislature made its grant of authority to the State Fire Marshal broad. Section 13211 authorizes the State Fire Marshal to "prepare and adopt building standards relating to fire and panic safety in high-rise structures" and to "establish minimum standards for the prevention of fire . . . ." Although the Legislature provides for specific considerations for new high-rises in section 13212, it sets forth no specific requirements for existing high-rises. Section 13213, subdivision (a), which relates to existing high-rises, merely requires that "[b]uilding standards and other regulations of the State Fire Marshal . . . shall provide to the greatest feasible extent for the safety of occupants of the high-rise structure and persons involved in fire suppression activities. . . ."

Finally, public policy also supports giving the enforcement agency discretion. The definition of "building access" should be sufficiently flexible to

accommodate various structural configurations. Moreover, the enforcing agency is in a position to make the best decision regarding the most reasonable access to the building and whether the building meets the requirements of a high-rise. Accordingly, we conclude that "building access" is to be determined by the enforcing agency and is to be reviewed only for its reasonableness.

3. *Evidence That the Hyde Street Level Provides "Building Access" Under the Statute*

The trial court found that Medina, the fire marshal during 1988, and Farrell, Medina's captain in charge of code enforcement, as well as the current fire marshal, Gary Massetani, testified that "building access" for the purposes of determining whether the building was a high-rise, was the main building entrance on Hyde Street. Captain Thomas Harvey, the current code enforcement officer for the fire department, also considered the building access to be the Hyde Street entrance. Indeed, city's argument focuses on the power of the fire marshal to make this determination and does not challenge the court's finding that the fire department considered the Hyde Street entrance as the level for "building access." In addition, the trial court found, based on expert testimony of Ballard's surveyor, that the measurement was 68.13 feet from the floor level at the front door of Hyde Street to the highest occupied floor of the building.

We conclude that city has not established that the interpretation of "building access" from the Hyde Street level was not reasonable. Moreover, we hold that substantial evidence supported the trial court's findings that this was the enforcing agency's interpretation and the measurement from that level to the penthouse floor was less than 75 feet.

4. *Two-foot Rule*

City maintains that, even if Hyde Street is the level for "building access" under the statute, the measurement should be from the mezzanine level under the two-foot rule. It is undisputed that the measurement from the mezzanine level to the penthouse floor exceeds 75 feet and therefore, according to city, the building is a high-rise structure under the statute.

At trial, city argued that the elevation of the exterior door opening for all three doors on Hyde Street is more than two feet above the adjacent ground level. Under the two-foot rule in California Building Standards Code section 403.11.1, when the elevation of the exterior door opening is more than two feet above the adjacent ground level, the measurement to the highest floor used for human occupancy shall be taken from the floor surface of the story or basement immediately below.

The trial court found that the evidence at trial established that the southerly door opening, which for some time did not contain an operable door, is less than two feet above the ground level. City does not challenge this finding and therefore we conclude that substantial evidence supported the court's finding that the two-foot rule does not apply.

■ Accordingly, we affirm the trial court's determination that the building does not qualify as a high-rise structure for the purpose of the fire prevention regulations and statutes.

### C. *Other Claims*

In addition to the claims regarding the partial sprinkler system, city claimed that enclosures of the stairways, trash chute doors, and bars on windows violated the regulations. These issues, however, were not presented in the briefs before this court and we therefore do not consider these issues on appeal.

City also presented an unfair business practices claim on behalf of the People of the State of California. Since we conclude that the fire protection required for high-rise structures did not apply to the building, this claim must also fail.[5]

### D. *Attorney Fees*

■ It is elementary that each party bears his or her own attorney fees in litigation, unless otherwise provided by contract or statute. (E.g., *Pacific Custom Pools, Inc. v. Turner Construction Co.* (2000) 79 Cal.App.4th 1254, 1267 [94 Cal.Rptr.2d 756].) No contract authorizes attorney fees in the present case but, pursuant to section 17980.7, subdivision (c)(11), the trial court awarded attorney fees in the sum of $128,200 to Ballard. City does not challenge the amount of the fees but argues the fees were not authorized under this statute.

The determination of the legal basis for an award of attorney fees is a question of law that we review de novo. (E.g., *Honey Baked Hams, Inc. v. Dickens* (1995) 37 Cal.App.4th 421, 424 [43 Cal.Rptr.2d 595].) We are not aware of any court that has considered the issue presented here, and therefore this is a question of first impression.

■ "[O]ur first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining such

---

[5] City's request that we take judicial notice of a document that indicates the population numbers for the City and County of San Francisco in 2001 and 2002 is denied, because such data are irrelevant to the issues addressed by this appeal.

intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. . . . The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386–1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) " 'Rules of statutory construction require courts to construe a statute to promote its purpose, render it reasonable, and avoid absurd consequences.' " (*Ford v. Gouin* (1992) 3 Cal.4th 339, 348 [11 Cal.Rptr.2d 30, 834 P.2d 724].) Exceptions to the general provisions of a statute are to be narrowly construed; only those circumstances that are within the words and reason of the exception may be included. (*City of Lafayette v. East Bay Mun. Utility Dist.* (1993) 16 Cal.App.4th 1005, 1017 [20 Cal.Rptr.2d 658].)

In the present case, city alleged in its pleading that, among other things, Ballard violated section 17920.3, which is part of the State Housing Law (§ 17910 et seq.). It requested attorney fees pursuant to section 17980.7, subdivision (d)(1). City, however, did not prevail on its claims and therefore was not entitled to attorney fees.

The clear language of section 17980.7, subdivision (d)(1) establishes that Ballard is not entitled to fees under this provision. This subdivision provides: "(d) If the court finds that a building is in a condition which substantially endangers the health and safety of residents pursuant to Section 17980.6, upon the entry of any order or judgment, the court shall do all of the following: [¶] (1) Order the owner to pay all reasonable and actual costs of the enforcement agency including, but not limited to, inspection costs, investigation costs, enforcement costs, attorney fees or costs, and all costs of prosecution."

The State Housing Law, however, has two separate attorney fees provisions: the foregoing, and section 17980.7, subdivision (c)(11). The court awarded Ballard attorney fees pursuant to this latter provision. Section 17980.7, subdivision (c)(11) reads in relevant part: "(c) The enforcement agency, tenant, or tenant association or organization may seek and the court may order, the appointment of a receiver for the substandard building pursuant to this subdivision. . . . [¶] . . . [¶] (11) The prevailing party in an action pursuant to this section shall be entitled to reasonable attorney's fees and court costs as may be fixed by the court."

City contends attorney fees under section 17980.7 may be awarded only to the enforcing agency in an abatement action under subdivision (d)(1) and to any party in a receivership action under subdivision (c)(11). Since neither

Ballard nor city filed motions based on receivership or in any other way presented evidence regarding a receivership, attorney fees should not have been awarded pursuant to this subdivision. Awarding attorney fees under subdivision (c)(11), city maintains, renders the one-way attorney fee provision of subdivision (d)(1) a nugatory. (See, e.g., *Slatkin v. White* (2002) 102 Cal.App.4th 963, 970 [126 Cal.Rptr.2d 54].)

Ballard responds that authorizing attorney fees under section 17980.7, subdivision (c)(11) does not render the language in subdivision (d)(1) meaningless, because the former only refers to attorney fees, while the latter permits the enforcing agency to recoup all its costs in prosecuting the case, including pre- and postjudgment costs. Ballard argues that the express language of the statute establishes that attorney fees are authorized. As already set forth, the statute provides, "The prevailing party in an action pursuant to this section shall be entitled to reasonable attorney's fees and court costs as may be fixed by the court." (§ 17980.7, subd. (c)(11).) Ballard argues that the construction urged by city would rewrite the statute and substitute "subdivision" or "action for a receivership" for "section."

Ballard argues that the Legislature's intent is particularly evident by using the word "section" in section 17980.7, subdivision (c)(11), because it provides definitions of "section" and "subdivision" elsewhere. The Legislature has set forth the following definitions: " 'Section' means a section of this code unless some other statute is specifically mentioned. Subdivision means a subdivision of the section in which that term occurs unless some other section is expressly mentioned." (§ 10.) Ballard maintains that section 17980.7 cannot be judicially revised to limit its construction to receivership actions. (See, e.g., *People v. Jones* (1993) 5 Cal.4th 1142, 1146 [22 Cal.Rptr.2d 753, 857 P.2d 1163].)

No revision is necessary to conclude that the trial court's award of attorney fees was unauthorized in the present case. We consider both the clear language of the statute *and the placement* of the attorney fees provision in section 17980.7. The attorney fees provision is not placed as its own subdivision in this section. (See § 17980.7, subd. (c)(11).) Rather, subdivision (11)—the provision regarding attorney fees to the prevailing party—is under (c). Subdivision (c) is limited *solely* to receivership proceedings. Ballard completely ignores this placement of the attorney fees and prevailing party provision. It is true that subdivision (11) uses the language of "section"; it is therefore authorizing attorney fees to the prevailing party in an action under section 17980.7. Thus, subdivision (c)(11) of section 17980.7 provides that the prevailing party in a claim pursuant to section 17980.7 shall be awarded attorney fees in the receivership proceedings. Here, there were no receivership proceedings.

Alternatively, Ballard argues that, even if the prevailing party provision applies only to a receivership action, city did request a receiver in its pleading and therefore he is still entitled to attorney fees under this provision. We disagree. Section 17980.7, subdivision (c) specifies that an enforcing agency "may seek and the court may order, the appointment of a receiver for the substandard building pursuant to this subdivision. . . ." Thus, this subdivision does not apply to every situation where a request for a receivership merely appears in the pleading. Rather, it applies when the party seeks and the court orders a receiver. In the present case, there were no receivership proceedings, because the court determined the building was not substandard. Since there were no receivership proceedings, no party prevailed in such proceedings.

Our construction of the statute not only considers the clear language and the placement of subdivision (11) under the subdivision related to receiverships (subd. (c)) in section 17980.7, but our construction is also consistent with the clear language of section 17984. Section 17984 provides: "Neither an enforcement agency, any of its officers, nor any city or county for which an enforcement agency may act, is liable for costs in any action or proceeding that the enforcement agency may commence pursuant to this article." If we were to interpret subdivision (c)(11) of section 17980.7 as urged by Ballard, then we would be interpreting it in a manner that is contrary to the express language of section 17984.

Ballard contends section 17984 is immaterial because only one of city's claims was made pursuant to the State Housing Law. He asserts that city is liable for costs because it lost its other three claims and he cites to *Department of Industrial Relations v. Lee* (1999) 73 Cal.App.4th 763, 769–770 [86 Cal.Rptr.2d 710]. *Lee* is inapplicable. In *Lee*, the court held that Labor Code section 101, which exempted the department from "court costs," referred to filing fees and the like and did not exempt the department from litigation costs to the prevailing party under Code of Civil Procedure section 1032. (*Lee, supra,* 73 Cal.App.4th at pp. 765–769.) In contrast, section 17984 exempts city from all costs, not simply court costs. Further, it is immaterial that only one of the four causes of action for public nuisance was brought under the State Housing Law. The gist of city's pleading is that the building did not comply with the State Housing Law and other regulations and codes because it did not have a complete sprinkler system. Thus, the tenor of the entire action is enforcement under that law. The specific unlawful business practices and housing code violations alleged in the complaint were clearly related to the State Housing Law enforcement action and therefore the role of the state law was not limited to this one nuisance claim. Section 17984 applied to the entire action.

More significantly, Ballard fails to address the clear inconsistency between section 17984 and his interpretation of section 17980.7, subdivision (c)(11). Both of these statutes are part of the State Housing Law. Ballard is arguing that he is entitled to attorney fees for prevailing in the enforcement action against him, but subdivision (c)(11) of section 17980.7 authorizes attorney fees *and* costs. However, section 17984 expressly disallows costs against an enforcement agency in a State Housing Law action. Thus, Ballard's interpretation is inconsistent with the clear language of section 17984 and contravenes the basic principle of statute construction that "statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible." (*Dyna-Med, Inc. v. Fair Employment & Housing Com., supra,* 43 Cal.3d at p. 1387.)

Finally, public policy does not support the construction urged by Ballard. Clearly, as indicated by section 17984, the Legislature did not want to discourage local enforcement agencies from pursuing public nuisance actions and protecting the public's interest. Permitting a defendant to collect attorney fees in these enforcement actions would stymie efforts to vigorously pursue such cases. Accordingly, we hold that the trial court's award of attorney fees was not authorized and reverse.

E. *Award of Sanctions*

City challenges the trial court's order of discovery sanctions against it for failing to produce two documents during discovery and failing to admit these documents' importance in requested admissions. These two documents established that city had approved the partial sprinkler system installed by the previous owner of the building. The two documents were subsequently made available to Ballard at trial, and the court admitted them into evidence. However, the court ruled that the delay in production "seriously hindered [Ballard] in the preparation of his defense and made the defense much more difficult, expensive and complex than it should have been."

The trial court granted Ballard sanctions in the amount of $6,733 and it further "conditionally" granted him the additional sum of $48,858.29. The court noted that the "*fees* sought as a sanction overlap and duplicate entirely the fees awarded to [Ballard] as prevailing party. The award of *fees* as a sanction will be effective only in the event that it should later be determined that this court erred in awarding prevailing party fees to defendant. In that event, defendant should recover attorney fees as a sanction for misuse of discovery in the total sum of $35,000. In that same event, defendant should recover in addition to such attorney fees, costs in the total amount of $13,858.29, in reimbursement for items of statutory costs, as sought in the cost bill filed by [Ballard]."

This is an unusual situation in that the court anticipated possible problems with its award of attorney fees, and then determined those fees that it deemed related to unnecessary litigation or costs related to city's failure to provide the documents. The general rule is that an order imposing sanctions on a party or its attorney is reviewable on appeal from the final judgment under the abuse of discretion standard. (Code of Civ. Proc., § 904.1, subd. (b).)

City maintains that it inadvertently failed to produce these two documents, known as the "blueys." City asserts that it did not know about its failure to provide Ballard with the documents until Ballard used them at trial. These documents were in the fire department's file and, according to city, Ballard's attorney had inspected this file. Further, city maintains this evidence was duplicative because it produced numerous documents establishing that the previous owner had installed seven sprinklers under the existing high-rise ordinance per city's request.

The trial court was in the best position to determine whether city admitted during the trial that the sprinkler system in 1979 had been inspected and approved as complying with NPFA Standard 13. The court found that city had initially denied this. These documents established that the inspections uncovered no code violations and the determination at that time that a complete fire sprinkler system was not necessary under NPFA Standard 13. Given the trial court's unique position of being able to listen to the argument and evidence we cannot say that these documents were not critical to Ballard's defense. The trial court was better able to determine that these documents were not cumulative of other evidence provided. Consequently, city has failed to establish that imposing sanctions was an abuse of discretion.

## II. *Ballard's Appeal*

Ballard filed a cross-complaint that contained a claim that the city's actions violated his state and federal civil rights. The court sustained without leave to amend the city's demurrer against this cause of action and he appeals that ruling.[6]

### A. *Standard of Review*

The standard of review governing an appeal of an order sustaining a demurrer without leave to amend is well established. " 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which

---

[6] Ballard asserts that, if city is unsuccessful in its appeal, he withdraws his appeal. It is unclear whether he is referring to the substantive issues and the attorney fees issue or simply to the former. We therefore consider the merits of his appeal.

may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

### B. *Allegations in Cross-complaint*

In his third cause of action in his cross-complaint, Ballard alleged that city violated his procedural and substantive due process rights and rights of equal protection under the United States and California Constitutions when it asserted that the building was a high-rise with an inadequate sprinkler system and then by recording an order to abate and filing a lawsuit. He also asserted that city should have joined his appeal in 1988 to challenge the classification of the building as a high-rise based on Chief Hayes's determination that the building is not a high-rise. He further alleged that the cause of action sounded in civil rights violations under 42 United States Code section 1983 and Civil Code section 52.1, subdivision (b).

Ballard specifically alleged the following in his cross-complaint: "During 1988 and 1989, Ballard requested of [city] by an through its local Fire Department that the Property be confirmed as not falling within the classification of a 'high-rise structure' as defined in the California Health and Safety Code. [City] was initially reluctant to do so, suggesting that Ballard make an appeal to the State Fire Marshal on the issue. [¶] . . . During 1988, Ballard in fact did so, receiving unwritten confirmation from the then-responsible State Fire Marshal personnel that the building was not a high-rise. Such personnel did not, however, issue a written decision prior to their retirement.

". . . Subsequently, the State Fire Marshal contended a joint appeal was required wherein the participation of the San Francisco Fire Department was necessary in order to reach the high-rise issue on any such appeal. At that time, [city] by and through its Fire Department personnel refused to cooperate or participate in any joint appeal to obtain an interpretive appeal of the building's contended high-rise classification."

### C. *Allegation of a Federal Civil Rights Violation*

As discussed above, Ballard alleged in his third cause of action in his cross-complaint that city violated his federal civil rights under section 1983 of

title 42 of the United States Code. This federal statute provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. . . ." (42 U.S.C. § 1983.)

We easily conclude the facts alleged in the third cause of action in the cross-complaint do not state a cause of action under title 42 United States Code section 1983. With regard to this claim, the cross-complaint alleges only that city is liable for depriving Ballard of his administrative remedy by not joining him in his appeal, by refusing to determine that the building was not a high-rise, and by contending the partial sprinkler system was inadequate when it had evidence that the fire marshal had determined it was in compliance.

Ballard contends a city can be sued under the federal civil rights statute. (See, e.g., *Pembaur v. Cincinnati* (1986) 475 U.S. 469, 478, fn. 5 [89 L.Ed.2d 452, 106 S.Ct. 1292] [it was undisputed petitioner's Fourth Amendment rights had been violated by entering petitioner's clinic].) There is no question that a municipality can be sued under title 42 United States Code section 1983, but to state a federal civil rights cause of action, a plaintiff must plead specific and nonconclusory facts showing the defendant deprived the plaintiff of rights, privileges, or immunities secured by the federal Constitution and laws. (42 U.S.C. § 1983; see also *Duffy v. City of Long Beach* (1988) 201 Cal.App.3d 1352, 1360 [247 Cal.Rptr. 715].) In *Monell v. New York City Dept. of Social Services* (1978) 436 U.S. 658 [56 L.Ed.2d 611, 98 S.Ct. 2018], the United States Supreme Court concluded that municipal liability under section 1983 is limited to deprivations of federally protected rights caused by action taken "pursuant to official municipal policy of some nature. . . ." (*Monell, supra,* at p. 691.) Section 1983 does not make actionable every injury in which a governmental employee may have played some role. (*Martinez v. California* (1980) 444 U.S. 277, 285 [62 L.Ed.2d 481, 100 S.Ct. 553].)

Here, Ballard alleges that the city's actions violated his procedural and substantive due process rights.[7] However, Ballard had an opportunity at the

---

[7] In his reply brief, Ballard cites to *Armendariz v. Penman* (9th Cir. 1996) 75 F.3d 1311, 1315, and maintains that the facts in the present case are similar to those in *Armendariz.* However, the issue before the Ninth Circuit in *Armendariz* was the defense of qualified immunity, which is not the issue here.

motion in limine hearing prior to trial to establish that city was bound by the State Fire Marshal's determination that the building was not a high-rise, and the court did not rule in Ballard's favor on this issue.[8] Further, Ballard has not alleged and has presented no evidence from the record to establish that city had an affirmative obligation to join him in a joint appeal that the building is a high-rise. Ballard must prove the city's action inflicting injury flowed from either an explicitly adopted or a tacitly authorized policy of city. (*Monell v. New York City Dept. of Social Services, supra,* 436 U.S. at p. 691.)

Ballard argues that the building complied with the code but city still engaged in a policy of attempting to force him to install a complete sprinkler system. City, at least on appeal, maintains there was a change in the interpretation of the regulations. Ballard merely asserts in a conclusory fashion that this was an unwarranted and illegal requirement and an abuse of power giving rise to a substantive violation of the due process clause. Ballard has not established that such a change of interpretation constituted a violation of his federal rights or in any way raises to the level of a deliberate decision by government officials to deprive him of his "life, liberty, or property." (See *Daniels v. Williams* (1986) 474 U.S. 327, 331 [88 L.Ed.2d 662, 106 S.Ct. 662].) Accordingly, we conclude the trial court properly ruled that Ballard failed to state a claim of a federal rights violation and the court did not abuse its discretion in refusing to permit him to amend the cross-complaint.

### D. *Allegation of a State Civil Rights Violation*

Ballard alleged that city's actions violated his rights pursuant to Civil Code section 52.1, subdivision (b). Civil Code section 52.1 reads in relevant part: "(a) If a person or persons, whether or not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, the Attorney General, or any district attorney or city attorney may bring a civil action for injunctive and other appropriate equitable relief in the name of the people of the State of California, in order to protect the peaceable exercise or enjoyment of the right or rights secured. . . .

"(b) Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the

---

[8] Prior to trial, the court heard evidence on Ballard's defense that city was barred from claiming the building was a high-rise because of its failure to exhaust its administrative remedies. Ballard claimed that the fire marshal's determination established that city had evidence it had made an earlier decision that the partial sprinkler system complied with the regulations. The trial court ruled that the fire marshal's determination was not binding on city.

Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision (a), may institute and prosecute in his or her own name and on his or her own behalf a civil action for damages . . . to protect the peaceable exercise or enjoyment of the right or rights secured."

In addition to the allegations set forth in his cross-complaint, Ballard argues in his brief before this court that city took away his control of the building by removing its top story and deprived him of appropriate tax deductions. He asserts that city threatened to impose $15 million in penalties on him in addition to the cost of installing a complete sprinkler system. He claims the city's purpose was to threaten him with partial demolition of the building and with monetary penalties in order to "coerce millions of dollars of unrequired construction."

City contends a claim under Civil Code section 52.1 requires violence or intimidation by threat of force (see, e.g., *Cabesuela v. Browning-Ferris Industries of California, Inc.* (1998) 68 Cal.App.4th 101, 111 [80 Cal.Rptr.2d 60]), which city maintains did not occur here. Ballard argues that the statute does not require violence. He asserts that cases suggesting violence is necessary, such as *Cabesuela, supra,* at page 111, improperly rely on *Boccato v. City of Hermosa Beach* (1994) 29 Cal.App.4th 1797, 1809 [35 Cal.Rptr.2d 282], which was criticized in *Venegas v. County of Los Angeles* (2004) 32 Cal.4th 820, 842 [11 Cal.Rptr.3d 692, 87 P.3d 1]. Ballard, however, creates a false argument; city does not argue that violence is required. Rather, city acknowledges that the threat of violence or coercion is sufficient and maintains that there is no allegation that meets this latter threshold requirement.

Civil Code section 52.1 does "require an attempted or completed act of interference with a legal right, accompanied by a form of coercion." (*Jones v. Kmart* (1998) 17 Cal.4th 329, 334 [70 Cal.Rptr.2d 844, 949 P.2d 941]; see also *Venegas v. County of Los Angeles, supra,* 32 Cal.4th at p. 843 [section 52.1 "provides remedies for 'certain misconduct that interferes with' federal or state laws, if accompanied by threats, intimidation, or coercion"].) Ballard has not alleged and the record does not establish any conduct that rises to the level of a threat of violence or coercion. Not only did city not interfere with any legal right as explained above, but Ballard has completely failed to satisfy the requirement that city engaged in a form of coercion. Accordingly, we conclude the trial court properly sustained the demurrer without leave to amend against the claim of a Civil Code section 52.1, subdivision (b) violation.

## DISPOSITION

The award of attorney fees is reversed. The judgment is otherwise affirmed. The matter is remanded to the trial court to enter a new judgment that does not include an award of attorney fees. The parties are to bear their own costs on appeal.

Kline, P. J., and Ruvolo, J.,* concurred.

---

*Presiding Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.