Filed 2/1/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| FREAR STEPHEN SCHMID et al.,<br><br>　　Plaintiffs and Appellants,<br><br>　　　　v.<br><br>CITY AND COUNTY OF<br>SAN FRANCISCO et al.,<br><br>　　Defendants and Respondents. | A158861<br><br>(City & County of San Francisco<br>Super. Ct. No. CGC-18-571283) |

Appellants Frear Stephen Schmid and Patricia Briggs open their argument in this appeal with the story of the destruction of a statue of the great composer Felix Mendelssohn in Leipzig, Germany in 1936. Against the wishes of the mayor of that city, who was out of town at the time, and without notice to anyone, the Mendelssohn statue was shattered to pieces one night by order of the deputy mayor, a Nazi who sought to erase any trace of Jewish contributions to the cultural history of Leipzig.

The story is bracing as history, and deservedly remembered as a cautionary tale, but has nothing to do with the law we are asked to apply in this case, or the facts. The dispute we deal with here is a local version of the controversies over removal of commemorative symbols, generally names and statues of historical figures, that have played out across the country recently. Centrally at issue is an administrative decision made by the San Francisco

Board of Appeals (the Board of Appeals or the Board) authorizing the removal of a bronze sculpture known as "Early Days," which was originally part of a Civic Center monument to the pioneer period of California (the Pioneer Monument).

In 2018, at the request of the San Francisco Arts Commission (Arts Commission), the San Francisco Historic Preservation Commission (HPC) granted a Certificate of Appropriateness (COA) "to alter a small scale character-defining feature in the Civic Center Landmark District"— specifically, to take down "Early Days" and place it in storage. Acting upon evidence of "significant adverse public reaction over an extended period of time," the HPC adopted a motion authorizing the removal of "Early Days" pursuant to the COA, and the Board of Appeals ultimately affirmed it.

Appellants Schmid and Briggs, two opponents of the removal, sued the City and County of San Francisco (the City) and affiliated defendants asserting a potpourri of claims, including a claim for violation of their civil rights under the Tom Bane Civil Rights Act (Civ. Code, § 52.1 (Bane Act)) and a claim seeking writ relief under Code of Civil Procedure sections 1085 and 1094.5. They allege that the Board of Appeals abused its discretion in authorizing the removal of "Early Days" and that the manner of the removal—which took place in the pre-dawn hours of the day following the Board of Appeals' decision—was illegal.

After the trial court sustained a demurrer without leave to amend, Schmid and Briggs appealed. We conclude the appeal has no merit and shall affirm.

# I. BACKGROUND

## A. *Factual Backdrop and Administrative Proceedings*[1]

Those who frequent the Civic Center area of San Francisco may recall that, adjacent to United Nations Plaza, sited in direct linear alignment with City Hall, there is a bronze statuary monument commemorating the era in which the state of California was founded. Part of a bequest left to the City by the James Lick Trust in 1876, the Pioneer Monument depicts this history in a series of vignettes. It seeks to honor the civic generosity of James Lick and other leading members of the pioneer generation, a group popularly known as the "forty-niners." When installed and dedicated in 1894 to commemorate the 44th Anniversary of the admission of California to the Union, the Pioneer Monument was originally placed on Market Street near the corner of Grove and Hyde Streets. Designed by the German sculptor Frank Happersberger, it included five groups of iconic figures, one of which was titled "Early Days."

At the ceremony to dedicate the Pioneer Monument in November 1894, E.B. Mastick, a member of the James Lick Trust, gave "a synopsis of the History of the [James Lick] Trust, its benefits and results." Mastick described "Early Days" as follows: It is a "group of three figures . . . consist[ing] of a native Indian reclining, over whom bends a Catholic priest, endeavoring to convey to the Indian some religious knowledge. On his face you may see the struggle of dawning intelligence." The featured speaker for

---

[1] We take the following background recitation from the facts alleged in the operative complaint and from various exhibits comprising the administrative record. At defendants' request, the trial court took judicial notice of these exhibits, without objection from plaintiffs. Among these exhibits are copies of the James Lick Trust and of the full program marking the ceremonial dedication of the Pioneer Monument in 1894.

the day, Willard B. Farwell, described "Early Days" in similar terms. He said it depicted "[t]he padre, fired with zeal and love of holy Church, lifting with tender care the savage from his low estate to walk the pathway of the Christian faith."[2]

Public criticism of "Early Days" for displaying a racist attitude toward Native Americans ultimately led to its removal in 2018, but when installed in 1894 the Pioneer Monument was controversial for a different reason. Many pioneers—Lick among them—amassed vast fortunes in the mining and railroad industries and eventually became notable philanthropists.[3] But their place in California history and culture was sharply contested in the 1890's, when the dedication ceremony took place. In a series of newspaper articles published shortly before the ceremony, several leading clerics were

---

[2] Farwell's description of the Pioneer Monument as a whole provides a sense of the homage to the pioneers that he delivered that day. Employing the ornate diction that was characteristic of the period, he said: "Still from their granite thrones these groups of bronze shall tell the story of the age of gold. . . . [¶] The padre, fired with zeal and love of holy Church, lifting with tender care the savage from his low estate to walk the pathway of the Christian faith . . . ; the miner, who made hill and gulch and stream yield up their golden wealth . . . ; the hardy throng—the tillers of the soil—that bade the fields to bud and bloom with plentitude of harvest, with fruits, with fragrant flowers and radiant pastures . . . ; the sails of commerce whitening all the seas that wash the borders of this bounteous land; great cities, thriving towns and countless homes, pulsing with radiant, prosperous social life; all this, these bronzes stand, defying storm and stress of rolling years, to tell to generations yet unborn how came into the world this Golden State."

[3] About the peers of Lick, Farwell said: "I can recall the names of Stanford, of Wilmerding, of Montgomery, of Robinson, of Cogswell, of Gibbs, of Hastings, of Mills—all of whom were or are members of The Society of California Pioneers—all of whom have made large public benefactions, and the aggregate of whose gifts swell the millions of Lick into many other millions yet."

quoted describing the pioneers as godless, amoral, prone to criminality, and unworthy of commemoration. While lavishing praise on Lick for his many civic contributions, Farwell devoted much of his nearly 10,000-word address to a rebuttal of these "reckless pulpit utterances."[4]

A century later, the Pioneer Monument again became a lightning rod for public controversy. To make way for the San Francisco Public Library, there was a proposal in the early 1990's to move the sculpture group to its current location in the Fulton Street right-of-way between the library and the Asian Art Museum. Schmid and Briggs acknowledge that, in connection with this proposed move, public complaints were received that the Pioneer Monument was "racist and offensive." But they point out that these criticisms did not carry the day. The Pioneer Monument was moved intact to Civic Center in 1993 with the support of then-Mayor Willie Brown, who reportedly said at an Arts Commission meeting "that he envisioned [it] as the center of a civic center complex . . . he expected to be the most interesting in the nation . . . [and] that San Francisco had always been a site of controversy between cultures."

---

[4] Just a few of Farwell's remarks on this subject are these: "[R]ecent attacks upon and criticism of California Pioneers and their descendants, from the pulpit of San Francisco ought to be met and refuted here and now"; "Recklessness of statement in regard to the influences of Pioneers upon the moral atmosphere of this community . . . goes hand in hand with misrepresentation and vilification of society in general in California"; "I stand appalled at the audacity that could have inspired this reckless misstatement of the truth, upon a question of such vital importance to this whole community. Nothing can now undo the evil thus sent forth into the world, to hold California and Californians up to the pity, if not to the contempt of mankind."

Twenty-five years later, charges of racial insensitivity surfaced again, but this time the City acted on them.  In December 2017, the Arts Commission applied to the San Francisco Planning Department (Planning Department) for the COA, which it requested on the following terms:  It sought authority for the "[r]emoval of the 'Early Days' bronze sculptural grouping, which is one out of five existing bronze sculptures on the Pioneer Monument.  The sculpture will be removed and prepared for storage by conservation professionals.  Storage will occur at an off-site location that provides adequate protection of the sculpture from physical and environmental damage or deterioration."  The COA required that the removal work take place pursuant to permits issued by the San Francisco Department of Building Inspection or other appropriate agencies.

Because the Pioneer Monument is located within a landmarked historic district, the first step in the administrative process took place before the HPC.  At a public hearing on February 21, 2018, on the application of the Arts Commission, the HPC took up a motion for issuance of the COA.  There is no evidence that anyone at the hearing raised an issue about a perceived need for environmental review.  Concurring with the Planning Department's staff-level determination that the proposed removal of "Early Days" is categorically exempt from environmental review, the HPC adopted the motion, granting the COA on the terms set forth in the application before the Planning Department and adding some conditions, most pertinently here that "a plaque shall be installed at the site of the Early Days sculpture to explain its removal."  Two weeks later, on March 5, 2018, the Arts Commission passed a resolution authorizing the removal and placement in storage of "Early Days" on the conditions set by the COA, as adopted by the HPC.

6

No one appealed the HPC's determination of categorical environmental exemption to the San Francisco Board of Supervisors (Board of Supervisors). Although Schmid did not attend the HPC's public hearing, he appealed the HPC's adoption of the COA to the Board of Appeals. The Board initially upheld that appeal and vacated the COA, but changed course on rehearing. At a public hearing on September 12, 2018, the Board voted four to zero to reverse its earlier decision, thereby reinstating the COA. Schmid and Briggs allege that, at the September 12 hearing, proponents of removing "Early Days" subjected them to hostile criticism for opposing removal. It is undisputed that, as Schmid and Briggs further allege, the City removed "Early Days" in response to public controversy surrounding "the assertion that it was racist and painful to Native Americans and those who shared the interpretation of it being racist[,] and that its existence represented white supremacy."

Once the COA was finally approved, the City acted immediately to implement it in accordance with the Arts Commission's resolution. The removal of "Early Days" took place in the pre-dawn hours of September 14, 2018, when a crew of workers arrived at the site of the Pioneer Monument and removed "Early Days" from its granite base, leaving the other four sculptures intact. "Early Days" was then placed in storage, where it now resides.

**B. *Complaint, Demurrer and Ruling on Demurrer***

Schmid, an attorney, alleges that he is a lifelong resident and taxpayer of the City with an abiding interest in the City's civic history. After the removal of "Early Days," he joined forces with Briggs, who alleges that she too is a San Francisco taxpayer, and together they brought suit in San

7

Francisco Superior Court seeking to overturn the order of the Board of Appeals authorizing removal of "Early Days."

Pointing to what they claim is "illegal conduct" in approving and carrying out the removal of "Early Days," Schmid and Briggs named as defendants (1) the City, (2) Tom DeCaigny, the Arts Commission's director of cultural affairs at the time of the removal, (3) Scott Atthowe, the contractor who carried out the removal, and (4) Atthowe's company, ARG Conservation Services, Inc.[5]  In their prayer for relief, Schmid and Briggs sought, among other things, an order requiring the restoration of "Early Days" to its original place within the Pioneer Monument.

The operative first amended complaint states four causes of action. First, Schmid and Briggs allege that the City Defendants and the ARG Defendants violated the Bane Act by depriving them of their constitutional rights through threat, intimidation, or coercion.  Second, Schmid seeks mandamus relief against the City Defendants based on a variety of alleged violations of constitutional and statutory law.  Third, Briggs alleges DeCaigny violated Code of Civil Procedure section 526a by illegally using public funds to remove "Early Days."  And fourth, Schmid and Briggs seek declaratory relief against the City Defendants and the ARG Defendants.

Attacking the claims against them by demurrer, the City Defendants and the ARG Defendants argued that neither the form nor substance of any of the four causes of action alleged in the first amended complaint states a viable cause of action.  The trial court agreed, sustained the demurrer in its

---

[5] Unless individually identified, we will reference DeCaigny collectively with the City as the "City Defendants," and we will reference Atthowe collectively with his company as "the ARG Defendants."

entirety, and ordered the action dismissed with prejudice, after finding that Schmid and Briggs would likely be unable to cure the defects in their claims.

This appeal followed.

## II. DISCUSSION

Except for the second cause of action seeking writ relief, which calls for a multi-level standard of review on appeal, as we explain in more detail below (see pt. II.B.1., *post*), our primary standard of appellate review here is as follows:  "We review a trial court's ruling on demurrer de novo [citation], giving ' "the complaint a reasonable interpretation, reading it as a whole and viewing its parts in context.  [Citations.]  We deem to be true all material facts properly pled.  [Citation.]  We must also accept as true those facts that may be implied or inferred from those expressly alleged." ' "  (*Mahan v. Charles W. Chan Ins. Agency, Inc.* (2017) 14 Cal.App.5th 841, 847.)  Bare conclusions devoid of any supporting facts, however, are insufficient to withstand demurrer.  (*Faulkner v. California Toll Bridge Authority* (1953) 40 Cal.2d 317, 329.)  And we review the denial of leave to amend following a dismissal on demurrer for abuse of discretion.  (*Aubrey v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 971.)

### A. *Bane Act Claim*

The first cause of action for violation of civil rights alleges that the City Defendants and the ARG Defendants violated the Bane Act by "altering, destroying, desecrating, physically defacing, and mutilating . . . Early Days." Their theory is that, by blocking "access to fine art and a dedicated public historic resource in a public forum," the City Defendants and the ARG Defendants infringed their First-Amendment-protected ability to "discuss, appreciate, contemplate, engage and interpret a dedicated piece of fine art"

9

and their rights as members of the public to the preservation of artifacts of significant cultural and historical value.

The trial court correctly ruled that appellants failed to allege facts constituting a cognizable claim under the Bane Act. (Civ. Code, § 52.1, subd. (c).)

Subdivision (b) of the Bane Act provides, " 'If a person or persons, whether or not acting under color of law, interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, the Attorney General, or any district attorney or city attorney may bring a civil action for injunctive and other appropriate equitable relief in the name of the people of the State of California, in order to protect the peaceable exercise or enjoyment of the right or rights secured.' " (*Cornell v. City and County of San Francisco* (2017) 17 Cal.App.5th 766, 791 (*Cornell*) [referencing former subd. (a) of Civ. Code, § 52.1].) Private parties may bring Bane Act claims under subdivision (c) of the statute on the same grounds. (Civ. Code, § 52.1, subd (c); *Cornell*, at p. 791 [referencing former subd. (b) of Civ. Code, § 52.1].)[6]

---

[6] A recent amendment to Civil Code section 52.1 effective in 2019 added a new subdivision (a), providing, "This section shall be known, and may be cited, as the Tom Bane Civil Rights Act," and redesignating former subdivisions (a) through (*l*) as new subdivisions (b) through (m), without substantive change. Due to apparent scrivener's error, the cross-references in former subdivision (b) to former subdivision (a)—where the phrase "as described in subdivision (a)" is used twice, making clear the two subdivisions are to be read together—were not carried over in the language of the newly redesignated subdivision (c). Because the cross-reference in new

" ' "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." ' " (*Cornell, supra*, 17 Cal.App.5th at pp. 791– 792.) Assuming without deciding that appellants have adequately alleged the violation of rights amenable to Bane Act enforcement, nowhere does the first amended complaint allege anything that might reasonably be construed as "threats, intimidation or coercion" to violate those rights.

Appellants argue there is no requirement of violence or threatened violence in the Bane Act. The City Defendants do not contend there is. In an effort to support an argument that they have adequately alleged "threats, intimidation or coercion," appellants cite *Gillan v. City of San Marino* (2007) 147 Cal.App.4th 1033, but that case involved an arrest without probable cause. (*Id.* at p. 1037.) Both *Gillan* and *Cornell* are wrongful arrest cases. Any arrest without probable cause involves coercion, and where accompanied by evidence of specific intent to violate the arrestee's Fourth Amendment rights, such an arrest may provide the basis for a Bane Act claim. (E.g., *Cornell*, *supra*, 17 Cal.App.5th at pp. 803–804.) This case is not remotely similar to that scenario. Appellants also cite *City and County of San Francisco v. Ballard* (2006) 136 Cal.App.4th 381, but that case cuts against

---

subdivision (c) to subdivision (a), if literally read, would render subdivision (c) incomprehensible, we read it as an intended cross-reference to newly redesignated subdivision (b) in order to remain faithful to clear legislative intent. We note the same error (failure to update the internal subdivision cross-referencing to account for new subdivision (a)) also appears in new subdivisions (d), (e), (k) and (*l*). Failure to update internal subdivision cross-referencing also affects subdivisions (i) and (j).

11

them.  The same thing the Court of Appeal said there in affirming the dismissal of a Bane Act claim may be said here.  Not only is the record bereft of any alleged conduct that "rises to the level of a threat of violence" but appellants also "completely fail[] to satisfy the requirement that city engaged in a form of coercion."  (*Ballard, supra*, at p. 408.)

## B. *Claims for Writ Relief*

In the second cause of action for writ relief, Schmid is the sole named plaintiff and the City and DeCaigny are the only named defendants.  This claim is alleged in a grab-bag style that is hardly a model of clarity, but we discern two main aspects to it.  First, and primarily, Schmid alleges that, on September 13, 2018, "[the City], acting through and by its Board of Appeal[s] issued its final administrative order denying plaintiff's appeal."  Second, Schmid alleges that, on September 14, "in a pre-dawn action, [the City] forcefully and by violent means removed the Early Days, desecrating, mutilating and altering it and the Pioneer Monument in the process, and asported it to and hid it at a secret location."  He alleges that both of these administrative actions—first, the final adjudication affirming the grant of the COA, and second, the implementation of that final administrative decision— were "invalid" and constituted "abuses of authority."

### 1. Applicable Standards of Review

"Code of Civil Procedure section 1094.5, the state's administrative mandamus provision, provides the procedure for judicial review of adjudicatory decisions rendered by administrative agencies.  [Citation.] Pursuant to Code of Civil Procedure section 1094.5, subdivision (b), '[t]he inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion.  Abuse of

12

discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.' . . . (Code Civ. Proc., § 1094.5, subd. (c).)" (*Young v. City of Coronado* (2017) 10 Cal.App.5th 408, 418 (*Young*).)

The scope of the trial court's review of administrative decisionmaking under this standard depends on whether the decision under review substantially affects a fundamental vested right: "Where the public agency's decision affects a fundamental vested right, the trial court exercises independent judgment in assessing whether the evidence is sufficient to support the agency's findings. [Citations.] In such cases, the court conducts a limited trial de novo and 'abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence.' (Code Civ. Proc., § 1094.5, subd. (c); [citation].) 'In all other cases, abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record.' (Code Civ. Proc., § 1094.5, subd. (c).)" (*Young*, *supra*, 10 Cal.App.5th at p. 418.) " '[T]he petitioner in an administrative mandamus proceeding has the burden of proving that the agency's decision was invalid and should be set aside, because it is presumed that the agency regularly performed its official duty.' " (*Id.* at p. 419.)

On appeal, we too conduct an independent review of the record where a vested right is at stake, but " '[w]hen the standard of review is the substantial evidence test . . . it is presumed that the findings and actions of the administrative agency were supported by substantial evidence. [Citations.] Thus, since the same standard of review applies . . . on appeal as [it] did in the trial court, the burden is on appellant to show there is no

substantial evidence whatsoever to support the findings of the Board.' " (*Young*, *supra*, 10 Cal.App.5th at p. 419.) "Finally, our review is not designed to rectify an imprudent decision by an administrative agency. Administrative mandamus is not to be used to control the discretion of an administrative body, but only to ensure that it was not abused. (See Code Civ. Proc., § 1094.5, subd. (f); [citation]; *Dore* [*v. County of Ventura* (1994)] 23 Cal.App.4th [320,] 326–327 ['Because the administrative agency has technical expertise to aid it in arriving at its decision, we should not interfere with the discretionary judgments made by the agency'].) It is for the agency to weigh the preponderance of conflicting evidence, 'as we may reverse its decision only if, based on the evidence before it, a reasonable person could not have reached the conclusion reached by it.' " (*Young, supra*, at p. 419.)

We evaluate the Code of Civil Procedure section 1085 strand of Schmid's claim for writ relief under a related but different set of principles. A "traditional writ of mandate under . . . section 1085 is used to compel a public entity to perform a legal and usually ministerial duty. [Citation.] The trial court reviews the challenged administrative action to determine whether it was arbitrary, capricious, or entirely lacking in evidentiary support, or whether the agency failed to follow the procedure and give the notices the law requires. [Citation.] On appeal, the trial court's factual findings must be upheld if they are supported by substantial evidence. However, legal issues present a question of law that this court reviews de novo on appeal." (*Shelden v. Marin County Employees' Retirement Assn.* (2010) 189 Cal.App.4th 458, 463.)

### 2. Claim for Writ Relief Under Code of Civil Procedure Section 1094.5

The trial court correctly rejected Schmid's demand for writ relief insofar as he sought a writ of administrative mandamus under Code of Civil Procedure section 1094.5. In evaluating that aspect of the second cause of action, we need not decide whether Schmid alleged any deprivation of a fundamental right adequately or at all, because, under either standard of review applicable to the court's ruling on this claim—substantial evidence or do novo—we must affirm.

Schmid alleges nothing to support his conclusory allegations that the Board of Appeals acted in excess of its authority or abused its discretion. On the administrative record presented here, the City has demonstrated that section 5.103 of the Charter of the City and County of San Francisco (Charter) authorizes the Arts Commission to "[a]pprove the design and location of all works of art before they are acquired, transferred or sold by the City and County, or are placed upon or removed from City and County property, or are altered in any way." Similarly, section 4.135 of the Charter confers jurisdiction on the HPC to "approve, disapprove, or modify certificates of appropriateness for work to designated landmarks or within historic districts." The Board of Appeals, in turn, may uphold or overturn such certificates following a public hearing. (Charter §§ 4.106(b), (d), 4.135.)

Pursuant to the jurisdiction conferred by the Charter, the HPC held a hearing, took evidence, and made a considered decision to issue the COA that was ultimately upheld by the Board of Appeals. The administrative record before the Board of Appeals includes an opinion from the City Attorney that there were no legal impediments to the removal and placement in storage of "Early Days," together with staff reports analyzing the reasons for removal

and its impact on the Civic Center Landmark District as a whole. These staff reports noted "significant" public comment in support of removal, and only "minor" public comment opposing it.) They also took note of the receipt of opinions from knowledgeable professionals (including from multiple scholars and policy statements from arts and conservation groups) and confirmed that the full history of the Pioneer Monument and prior public debate surrounding it had been taken into account. By any measure, all of that constitutes substantial evidence.

The HPC's decision granting the COA, which is incorporated by reference in the first amended complaint, expressly states that its findings are based on consideration of "case reports, plans, and other materials . . . contained in the [Planning] Department's case files, . . . testimony and . . . materials from interested parties [received] during the public hearing on the [removal] Project." Reciting a series of legal conclusions, the first amended complaint alleges that the HPC's findings were "nothing but a transparent cloak and subterfuge." But it offers nothing to overcome the substantial record evidence supporting the COA.[7] As pleaded, therefore, the dismissal of

_____

[7] Schmid contends that, when the City arranged for the immediate removal of "Early Days" following the Board of Appeals' decision, it notified representatives of certain Native American tribes of the scheduled pre-dawn removal on September 14, but it failed to give notice to anyone else. This selective notification, it is argued, is further evidence of discriminatory animus because it prevented opponents of removal from appearing and exercising their First Amendment rights to express their opposition. The alleged facts concerning selective notification of the removal work do not appear in the first amended complaint and are apparently based upon an email that was produced to appellants in discovery. At the hearing on the demurrer, Schmid requested that the trial court take judicial notice of this email. The court denied that request, and neither Schmid nor Briggs has

16

the second cause of action must be affirmed. (*Faulkner v. California Toll Bridge Authority, supra*, 40 Cal.2d at p. 329 ["[a]llegations that the acts of a commission or board were 'arbitrary, capricious, fraudulent, wrongful and unlawful,' like other adjectival descriptions of such proceedings, constitute mere conclusions of law which are not to be deemed admitted by a demurrer"].)

### a. *Discriminatory Animus*

Lacking any basis for a substantial evidence challenge to the Board of Appeal's September 12, 2018 decision, Schmid invites us to employ a de novo standard of review based on his assertion that the Board's decision to affirm the HPC's issuance of the COA was incorrect as a matter of law. We reject that line of attack as well. The most prominent theme in the many legal arguments Schmid puts forth is that the Board's decision to uphold the COA discriminated against him, both ethnically as someone of European heritage and based on his views. His premise is that the Board had no authority to engage in invidious discrimination, an unexceptional proposition in the abstract but not one that is supported by specifics alleged in the operative complaint. Schmid insists that he pleaded enough to survive a demurrer, pointing to alleged comments at the hearing before the Board by members of the public (not the City) and of a then-member of the Board of Supervisors who was not a decision maker in connection with the affirmance of the COA. But whatever motives those speakers had cannot be attributed to the Board of Appeals.

---

appealed from that ruling. We have considered these allegations in connection with our review of whether the trial court erred in denying leave to amend the first amended complaint (see pt. II.E., *post*), but not insofar as they may bear on the court's ruling on the demurrer.

In the sole case Schmid relies upon for his argument that the Board of Appeals was motivated by discriminatory animus, *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n* (2018) 584 U.S. ___ [138 S.Ct. 1719], a member of the Colorado Civil Rights Commission made some comments that showed religious hostility and bias toward a party before it. (*Id.* at p. 1729.) That did not happen here. No member of the Board of Appeals made any such comments. Nor does Schmid offer any specific facts establishing that the Board's decision was in excess of the jurisdiction granted under City law, or that it lacked substantial evidence supporting a decision in favor of the COA. Despite Schmid's vigorous opposition, the Board of Appeals had discretion to approve the issuance of the COA so long as its decision was supported by substantial evidence, which this decision was.[8]

b. *Violation of the California Arts Preservation Act*

In addition to alleging discriminatory animus, Schmid claims that the approval of a COA by the Board of Appeals authorizing removal of "Early Days" violated his "right to the preservation of fine art." As support for this alleged right, Schmid cites Civil Code section 987, the California Arts Preservation Act (CAPA). (See *Lubner v. City of Los Angeles* (1996)

---

[8] In his reply brief, Schmid cites *Village of Arlington Heights v. Metropolitan Housing Development Corp.* (1977) 429 U.S. 252 in support of an argument that "[d]epartures from the normal procedural sequence" in the decisionmaking process of the agency involved may be indicative of discriminatory animus, circumstantially, particularly when combined with explicit statements by members of the decisionmaking body, or in minutes of its meetings, or in reports on which it has relied. (*Id.* at p. 267.) That argument fails for the same reason Schmid's *Masterpiece Cakeshop* argument fails—here there are no such explicit statements by any member of the Board of Appeals—and to the extent it goes beyond that and seeks to point us to circumstantial evidence of discriminatory animus under *Village of Arlington Heights*, we will not entertain arguments made for the first time in reply.

45 Cal.App.4th 525, 528–530.) Under subdivision (c)(1) of CAPA, "No person, except an artist who owns and possesses a work of fine art which the artist has created, shall intentionally commit, or authorize the intentional commission of, any physical defacement, mutilation, alteration, or destruction of a work of fine art."

Schmid's theory seems to be that any member of the public, on behalf of an artist who created a work of public art, has standing to enforce CAPA. Putting aside whether CAPA has not been preempted by a counterpart federal statute (17 U.S.C. § 106A, the Visual Artists Rights Act of 1991 (VARA); see *Cort v. St. Paul Fire & Marine Ins. Cos., Inc.* (9th Cir. 2002) 311 F.3d 979, 982), we disagree. "Both VARA and CAPA prevent the modification or destruction of certain works of art without the consent of the artist." (*Cort, supra,* 311 F.3d at p. 982.) These statutes create rights that are personal to artists. Only a person who created a work of art (e.g., *Lubner v. City of Los Angeles, supra,* 45 Cal.App.4th at p. 527) or the heirs of such a person (e.g., *Cort, supra,* 311 F.3d at p. 982) may enforce them. Schmid's attempt to invoke Civil Code section 987 fails because he does not allege either the destruction of "Early Days"—he admits it is in storage—or that he has authority to act on behalf of the artist who created "Early Days."

c. *Violation of Federal Historic Preservation Standards*

Schmid next alleges that the City, acting through the Board of Appeals, has "violated federal law (inter alia 54 U.S.C. § 302501 et seq.) pertaining to National Historic District and grant money (54 U.S.C. § 302902) in that it has received federal grant money from the federal government . . . (54 U.S.C. § 302503)" and, as a certified local agency receiving such funds, "has obligated itself . . . to act in accordance with and obey federal law and

19

guidelines . . . in reference to historic resources."[9]  Even assuming Schmid has standing to enforce federal law against the City based on no injury to himself apart from that suffered by any member of the public—appointing himself, in effect, a private attorney general based on his "deep and abiding interest . . . in [the City], [its] affairs, politics, public art, historic attributes, and its history in general"—the allegations in the first amended complaint fail to allege a viable basis for such a claim.

Though Schmid only generally alleges the violation of "federal law and guidelines . . . in reference to historic resources" that he has in mind, the HPC, in fact, made a series of findings, citing to specific federal guidelines, in granting the COA.  Among other things, the HPC specifically found that (1) "While this project would cause a reduction in the number of bronze sculptural figures on public display as part of the Pioneer Monument, it would not materially alter the character defining features or spatial relationships of the" Civic Center Landmark District; (2) "Historic features, materials and finishes dating from the district's period of significance would be retained"; (3) "The proposed project would not add any conjectural features or features that lend a false sense of historical development"; and (4) "If the proposed work were to be reversed in the future, the essential form and

_____

⁹ Schmid does not provide a citation to these guidelines, in his first amended complaint or in his brief on appeal, but we do note that, pursuant to statutory authority conferred by 54 United States Code section 306131, subdivision (b), the Secretary of the Interior has promulgated a set of guidelines entitled "Archeology and Historic Preservation; Secretary of the Interior's Standards and Guidelines," which first appeared in the Federal Register, September 29, 1983 (48 Fed.Reg. 44716).  The entire set of these guidelines is currently available at <https://www.nps.gov/history/local-law/arch_stnds_0.htm> (as of Feb. 1, 2021).  We will not speculate as to which of these guidelines Schmid has in mind.

20

integrity of the site and the surrounding district would remain intact." And based on these findings, citing Standards 1–3 and 5–10 of the Secretary of Interior's Standards for Rehabilitation, the HPC determined that the proposed removal project was consistent with federal law. Schmid omits any discussion of these specific findings and makes no attempt to explain why the overall legal conclusion the HPC drew from them is wrong.

Instead, arguing at a broad level of generality, Schmid suggests that since the COA authorized the removal of "Early Days," the COA is necessarily a violation of the Secretary of the Interior's guidelines because removal is the antithesis of preservation. "It is self-evident from the name Historic Preservation Commission," he argues, "that it abused its discretion when it failed to preserve, but rather acted to desecrate and materially alter the oldest historic element of the Civic Center Historic District—the Pioneer Monument." Simple as it seems, the syllogism is incorrect. In the discretionary judgment of the HPC, as upheld by the Board of Appeals, this alteration did not materially detract from the character of the Civic Center Landmark District as a whole. Schmid may disagree, and he may disagree vehemently, but his disagreement is with the Board's exercise of discretion, not with a failure to abide by applicable law. We therefore reject his claim that the Board's decision to uphold the COA was an abuse of discretion on the ground that it violated federal law.

d. *Public Nuisance*

Another component of Schmid's demand for writ relief under Code of Civil Procedure section 1094.5 is that, in upholding the issuance of the COA, the Board abused its discretion by creating a public nuisance. The trial court correctly ruled that the first amended complaint fails to state a viable public nuisance claim. "The public nuisance doctrine is aimed at the protection and

21

redress of community interests and, at least in theory, embodies a kind of collective ideal of civil life which the courts have vindicated by equitable remedies since the beginning of the 16th century." (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1103, italics omitted.) "To qualify, and thus be enjoinable, the interference [with collective social interests] must be both substantial and unreasonable." (*Id.* at p. 1105, italics omitted.)

Schmid's attempt to invoke the public nuisance doctrine fails because he does not allege any of the following: (1) that the City, by acting or failing to act, created a condition that was harmful to health or obstructed the free use of property, so as to interfere with the comfortable enjoyment of life or property; (2) that those actions affected a substantial number of people at the same time; (3) that an ordinary person would be reasonably annoyed or disturbed by the condition; (4) that the seriousness of the harm outweighs the utility of the City's conduct; and (5) that appellants suffered harm that was different from the type of harm suffered by the general public. (1 CACI 2020 (2019).)

   e. *Violation of the California Environmental Quality Act (CEQA)*[10]

The first amended complaint alleges that the City, through the Board of Appeals, "failed its obligation to adhere to CEQA protection for historic resources by refusing to require an [environmental impact report]." (See Pub. Resources Code, § 21084.1; Cal. Code Regs., tit. 14, § 15064.5.) Citing only "common sense" and the size of the sculpture (over six feet tall and weighing more than a ton), Schmid argues on appeal in conclusory terms that the removal of "Early Days" was not exempt from CEQA review.

---

[10] Public Resources Code section 21000 et seq.

22

The trial court correctly concluded that these allegations state no cognizable claim under CEQA because Schmid did not appeal to the Board of Supervisors the determination by the HPC that the removal of the statue is categorically exempt from environmental review, as required to exhaust administrative remedies under CEQA.  (Pub. Resources Code, § 21151, subd. (c).)  We review the applicability of the exhaustion doctrine de novo.  (*Defend Our Waterfront v. State Lands Commission* (2015) 240 Cal.App.4th 570, 580 (*Defend Our Waterfront*).)  Exhaustion of administrative remedies is "a jurisdictional prerequisite" to a CEQA lawsuit, "not a matter of judicial discretion."  (*Tahoe Vista Concerned Citizens v. County of Placer* (2000) 81 Cal.App.4th 577, 589 (*Tahoe Vista*).)  The statutory exhaustion requirement mandates that each allegation of noncompliance with CEQA, including disagreement with a determination of categorical exemption, must be "presented to the public agency" orally or in writing . . . prior to the close of the public hearing" at which the CEQA decision is made.  (Pub. Resources Code, § 21177, subd. (a).)  A litigant must also have been personally responsible for raising some claim of noncompliance with CEQA before the decision was made.  (Pub. Resources Code, § 21177, subd. (b).)

These two statutory prerequisites may be overlooked, however, if notice of the hearing was defective.  (Pub. Resources Code, § 21177, subd. (e).)  For that reason, evidently, Schmid denies there was a CEQA-compliant notice before the HPC adopted the categorical exemption.  He contests the adequacy of notice, claiming there was "not a solitary word" about CEQA in the City's notice documents in advance of the HPC hearing.[11]  In support of his lack-of-

[11] The record shows that Planning Department staff initially recommended a categorical exemption under California Code of Regulations,

23

prehearing-notice argument, Schmid claims the City "misdescribed" the project by calling it a "small scale contributing feature" of the Civic Center Landmark District. He relies on *McQueen v. Building Director* (1988) 202 Cal.App.3d 1136 (*McQueen*), in which the plaintiff alleged a regional open space district approved a categorical exemption in connection with a land acquisition project, without disclosing that the land to be acquired was contaminated with hazardous waste materials. (*McQueen,* at pp. 1143–1145.) The plaintiff successfully argued that the "incomplete and misleading description of the project" rendered the granting of a categorical exemption erroneous under CEQA, and the court ordered the district to engage in environmental review before implementing any plan for the acquired property. (*McQueen*, at pp. 1140, 1152–1153.) *McQueen* is distinguishable because, in this case, the notice of the HPC's February 21 meeting set forth an accurate description of the project.

So far as we have been able to discern from the record, however, Schmid is correct that there was no notice in advance of the February 21 meeting that a categorical exemption from plenary CEQA review might be on the agenda. That implicates our holding in *Defend Our Waterfront*, *supra*, 240 Cal.App.4th 570, a case cited by neither party. At issue there was the adequacy of notice for purposes of Public Resources Code section 21177,

---

title 14, section 15301, without a prior hearing. An undated document entitled "Certificate of Appropriateness Case Report" describing the Arts Commission's December 5, 2017 application for the COA and reporting a staff-level determination that the proposed project was categorically exempt from environmental review appears to have been posted on the Planning Department's Web site, but the record does not disclose when it was posted. The HPC adopted the recommended exemption as well as the COA itself after holding a public hearing on February 21, 2018.

subdivision (e), where the State Lands Commission (SLC) placed the project at issue, the approval of a land exchange agreement, on its meeting agenda but failed to indicate that a CEQA exemption would be considered. We were clear that the hearing notice was insufficient to justify invocation of the statutory exhaustion doctrine. "[T]he only notice provided by the agenda for the August 14 SLC meeting was that the SLC was considering a land exchange agreement proposed by the City. The agenda did not notify anyone that the SLC would also consider invoking a statutory exemption to CEQA; nor, indeed, did it make any reference to CEQA at all. Thus, to the extent Government Code section 11125, subdivision (a) establishes what notice the SLC must provide of its intention to invoke a CEQA exemption, that notice requirement was not met by posting the SLC meeting agenda." (*Defend Our Waterfront*, *supra*, 240 Cal.App.4th at pp. 583–584.)[12]

But *Defend Our Waterfront* does not fully resolve the exhaustion issue presented here. A defective HPC hearing notice only relieves Schmid from the requirements of Public Resources Code section 21177, subdivisions (a) and (b) that any objection he may have had to the categorical exemption be presented to the HPC. It does not excuse him from exhausting additional

---

[12] In *Defend Our Waterfront*, *supra*, 240 Cal.App.4th at pages 584–585, there was a staff report indicating that the agency intended to invoke a CEQA exemption, but that was held to be insufficient notice. (*Defend Our Waterfront*, *supra*, at p. 585 ("because the SLC staff report was not linked to the SLC website 10 days before the August 14 meeting, the publication of that report could not supply the notice required by Government Code section 11125, subdivision (a)").) Presumably, there were written materials supporting the staff-level recommendation that preceded the HPC hearing. (*Ante*, fn. 11.) Assuming such materials existed, there is no record evidence they were posted sufficiently in advance of the HPC hearing or linked to the HPC's meeting agenda.

administrative review remedies that were available to him. The rule requiring exhaustion of remedies applies in CEQA cases independently of Public Resources Code section 21177. (See *Tahoe Vista, supra,* 81 Cal.App.4th at pp. 589–594 [issues not raised by plaintiffs in the final administrative proceeding approving the project are forfeited by failure to exhaust].) Under CEQA and San Francisco Administrative Code, chapter 31, any appeal of a categorical exemption determination must be made to the Board of Supervisors, as the body of elected officials responsible for making final CEQA determinations. (Pub. Resources Code § 21151, subd. (c); Cal. Code Regs., tit. 14, § 15061, subd. (e); S.F. Admin. Code, § 31.16, subd. (a).)

Schmid ignored these administrative review requirements and presented his CEQA objections only to the Board of Appeals, which had no jurisdiction over a CEQA appeal. In so doing, he failed to exhaust administrative remedies and sacrificed his right to bring a CEQA cause of action. (See *Tahoe Vista, supra,* 81 Cal.App.4th at pp. 589–594.) Although Schmid did not attend the HPC public hearing, the HPC's approval of the COA, and its approval of the CEQA categorical exemption, were appealable within 30 days. (S.F. Admin. Code, 31.16, subd. (e)(2)(B)(i).) The record is unclear as to when the HPC posted its decision, but Schmid plainly knew of it within 30 days of the February 21 hearing because he filed his appeal with the Board of Appeals on March 19, 2018. In fact, he raised a CEQA objection with the Board of Appeals not once, but twice, once in his opening brief supporting the appeal and once in opposition to the motion for reconsideration. It is undisputed, however, that he did not separately appeal the CEQA determination to the appropriate body. To explain why he skipped the Board of Supervisors, Schmid argues that the City has "created a regulatory morass that subverts CEQA and which CEQA preempts," but he

offers no authority for that proposition—understandably, because the CEQA regulations expressly contemplate that "[a] local lead agency may establish procedures governing . . . appeals" to the "local lead agency's elected decisionmaking body." (Cal. Code Regs., tit. 14, § 15061, subd. (e).)

Finally, Schmid advances the argument that even if the City's requirement that he appeal to the Board of Supervisors is valid, he had no obligation to comply because, in light of a resolution passed by the Board of Supervisors in May 2018 agreeing with the HPC's issuance of the COA and the Arts Commission's COA implementation resolution, such an appeal would have been futile. We are not persuaded. To begin with, while in his opening brief Schmid quotes from a May 2018 Board of Supervisors resolution, the resolution is not in the record. But assuming arguendo such a resolution did issue and is properly subject to judicial notice, the fact the Board of Supervisors agreed as a policy matter with the issuance of the COA says nothing definitive about its views of the appropriateness of a categorical exemption under CEQA. Even if the Board of Supervisors agreed on the merits that "Early Days" should be removed, it may have disagreed *as a process matter* with the HPC's use of a categorical exemption, since, as an elected body, it might have opted for the more robust, and more publicly transparent procedure of requiring an environmental impact report before going forward with the removal. But because the Board of Supervisors was never presented with reasoned arguments addressing the appropriateness of a categorical exemption, we can only speculate about what it would have done. We conclude, therefore, that having failed to appeal the HPC's approval of a CEQA categorical exemption to the Board of Supervisors in September 2018 or at any time, Schmid failed to exhaust his administrative remedies.

f. *Violation of Trust Duties*

In addition to the foregoing claims of discriminatory animus, violation of state and federal statutory law governing preservation of historic resources, creation of a public nuisance, and violation of CEQA, Schmid relies on two theories that the Board's decision to uphold the COA violated trust duties. First, he advances an imaginative but flawed claim based on the public trust doctrine. " 'While the public trust doctrine has evolved primarily around the rights of the public with respect to tidelands and navigable waters, the doctrine is not so limited.' [Citation.] More than ' "a set of rules about tidelands," ' or ' "a restraint on alienation by the government," ' this doctrine functions ' "largely as a public property right of access to certain public trust natural resources for various public purposes." [Citation.]' [Citation.] Thus, the doctrine protects 'expansive public use of trust property.' [Citation.] [¶] The range of public trust uses is broad, encompassing not just navigation, commerce, and fishing, but also the public right to hunt, bathe or swim." (*San Francisco Baykeeper, Inc. v. State Lands Com.* (2015) 242 Cal.App.4th 202, 233.) Broad as it is, no court has ever held that this wide range of protected uses extends to viewing public art. We decline to be the first. While we have no doubt that public art is a valuable resource that should be available to all members of the public, it is not a *natural* resource.

Second, in an attempt to found his legal claim to Code of Civil Procedure section 1094.5 relief directly on the origin story of the Pioneer Monument, Schmid alleges that the Board of Appeals' approval of the COA violated the City's duties as the trustee of the James Lick Trust. Citing Civil Code section 987, the statute designed to bar destruction or mutilation of works of art, and recitals in the 1993 statutory scheme which created the

28

California Heritage Fund (Pub. Resources Code, § 5079 et seq.) for the purpose of "encourag[ing] the stewardship and preservation of California's historical resources" (*id.*, § 5079, subd. (f))—he focuses in particular on a legislative finding that "[t]he preservation of California's historical resources is a responsibility of all citizens" (*id.*, subd. (a))—Schmid claims he may sue to rectify what he believes is a violation of the James Lick Trust. This theory is a more elaborate version of Schmid's attempt to sue for violation of Civil Code section 987. The problem with it is that he has no standing to enforce the terms of the James Lick Trust. Except for persons who may sue in the name of a charitable corporation or officers or shareholders thereof, and with the exception of the Attorney General, a plaintiff suing to enforce the terms of a charitable trust must hold "a reversionary, contractual, or property interest in the assets subject to such charitable trust." (Corp. Code, §§ 5142, subd. (a)(4), 7142, subd. (a)(4).) Schmid makes no allegation that he is such a person. Airy notions of the responsibility all citizens have to preserve historical resources are not enough.

### 3. Claim for Writ Relief under Code of Civil Procedure Section 1085

An additional basis for his demand for writ relief, pleaded in support of a claim for a traditional writ of mandate under Code of Civil Procedure section 1085, Schmid attacks the manner in which the work executing the COA was undertaken, rather than the administrative decision to approve it. Here, he alleges that the removal of "Early Days" followed so quickly on the heels of the Board of Appeals' decision to uphold the COA that a condition attached to the COA—the placement of a plaque explaining the removal— was ignored. In his opening brief on appeal, though not in the operative complaint, he also contends that the expedited removal work took place in

violation of governing permit conditions, specifically that there be a 72-hour waiting period before removal could take place.  Neither of these two lines of attack provides a basis for issuance of a traditional writ of mandamus under Code of Civil Procedure section 1085.

"An essential element of a cause of action for mandamus is the existence of a clear, present and usually ministerial duty upon the part of the respondent.  [Citations.]  A ministerial duty is an act that a public officer is obligated to perform in a prescribed manner required by law when a given state of facts exists."  (*Jones v. Omnitrans* (2004) 125 Cal.App.4th 273, 278.)  Calling the plaque's installation a "condition precedent to the [statue's] removal"—a contention belied by the record—Schmid claims the "drafting [of] its language [has] never been complied with."  But drafting of language for the plaque is by its nature not a ministerial act and must precede the plaque's installation.

Beyond failure to install the plaque, it is unclear precisely what ministerial duty Schmid sought to enforce.  In fact, he expressly sought to *prevent* installation of the plaque pending preparation of an environmental impact report.  "Early Days" has been removed and placed in storage.  Clearly, he seeks the reversal of that action—the restoration of "Early Days to [its original place within] the Pioneer Monument"—but as the trial court correctly concluded, "the [Arts Commission] had discretion to remove the statue based on racism and the Court may not interfere with its decision."  The removal work having been completed months before this action was filed, Schmid's complaint about violation of permit conditions presented no live controversy that the trial court could have cured, even had such a violation been properly alleged.  (*In re N.S.* (2016) 245 Cal.App.4th 53, 58 ["As a general rule, it is a court's duty to decide ' " 'actual controversies by a

30

judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.' " ' "].)

## C. *Claim for Waste of Public Funds*

In the third cause of action, Briggs alleges DeCaigny illegally used $150,000 of City funds to remove and store the statue, thereby giving rise to a claim under Code of Civil Procedure section 526a. This statute establishes the right of a taxpayer plaintiff to maintain an action against any officer of a local agency to obtain a judgment restraining or preventing illegal expenditure, waste, or injury of the estate, funds, or property of said agency. (Code Civ. Proc., § 526a.)

A claim under this statute does not lie to attack exercises of administrative discretion and may not be employed to interfere with policymaking. (*San Bernardino County v. Superior Court* (2015) 239 Cal.App.4th 679, 686 [" '[T]axpayer suits are authorized only if the government body has a duty to act and has refused to do so. If it has discretion and chooses not to act, the courts may not interfere with that decision.' "]; *Humane Soc'y of the United States v. State Bd. of Equalization* (2007) 152 Cal.App.4th 349, 356 ["[S]ection 526a has its limits. In particular, the courts have stressed that the statute should not be applied to principally 'political' issues or issues involving the exercise of the discretion of either the legislative or executive branches of government."].)

DeCaigny, as the Arts Commission's director of cultural affairs at the time of the removal, wielded the executive discretion to remove works of art that did not fit the Commission's vision, per rule 7.3.3 of the Policies and Guidelines for the Civic Art Collection of the City and County of San Francisco. He acted within his discretionary limits as Arts Commission

31

director of cultural affairs when removing the statue, and cannot be sued under Code of Civil Procedure section 526a. The trial court was therefore right to sustain the demurrer with respect to the third cause of action.

**D.** *Claim for Declaratory Relief*

This brings us to the fourth cause of action, the claim for declaratory relief. Schmid and Briggs seek a declaration invalidating the removal of "Early Days" and ordering it returned to its location within the Pioneer Monument, effectively restoring the monument to its original condition. Because this claim adds nothing of substance to the first three pleaded claims other than a demand for a specific form of relief, it fails for the same reasons the preceding three claims fail. In the absence of an actual controversy upon which the court could rule, the demurrer to the fourth cause of action for declaratory relief was properly sustained.

**E.** *Dismissal Without Leave To Amend*

Finally, Schmid and Briggs contend the trial court abused its discretion by refusing to grant them leave to amend the first amended complaint to cure the defects for which dismissal was ordered. We think not. Failure to grant leave to amend constitutes an abuse of discretion only if there is a reasonable possibility that the defect can be cured by amendment. (*Aubrey v. Tri-City Hospital District*, *supra*, 2 Cal.4th at p. 971.)

Schmid and Briggs contend that, even if their attempt to plead a Bane Act claim fails, the first amended complaint, in substance, alleges a viable claim under title 42 United States Code section 1983 (section 1983), and they deserve a chance to allege such a federal claim expressly. To plead a claim under section 1983, courts require plaintiffs to "plead that (1) the defendants acting under color of state law (2) deprived plaintiffs of rights secured by the Constitution or federal statutes." (*Gibson v. United States* (9th Cir. 1986)

781 F.2d 1334, 1338.) Schmid and Briggs argue they have stated facts sufficient to support a section 1983 action based on concerted action, by the City Defendants, and by the ARG Defendants acting together with the City Defendants, to deprive them of their protected rights under the United States Constitution.

We do not see how. Putting to one side the fact that there appears to be no basis to charge the ARG Defendants with acting under color of law, the fundamental stumbling block to a section 1983 claim against any of the defendants named in this case is that Schmid and Briggs cannot demonstrate they have a viable basis to claim there was a deprivation of federally protected rights. They insist that "the COA and [Arts Commission] Resolution were ethnically and racially motivated in favor of one racial/ethnic group, Native Americans[,] . . . served substantially to suppress freedom of thought, freedom of artistic expression, and freedom of speech[,] and served to discriminate in favor of certain preferred speech over [that of] others.' " But as we noted above in addressing appellants' allegation of discriminatory animus as a basis for writ relief, these charges of racially discriminatory motivation are conclusory and devoid of any specifics that may be attributed to an actual decision maker in the chain of administrative decisionmaking under review. As a result, they are not enough to overcome the presumption of good faith we normally give to official action. (See *County of Los Angeles v. Superior Court* (1975) 13 Cal.3d 721, 727 [" ' "The decisions of this court from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exerted." ' "].)

To the extent the HPC chose to exercise its discretion in a manner Schmid and Briggs feel disfavors one group of people or one point of view over

33

another, we need only state the obvious: Governing requires policy choices to be made. And in carrying out those choices, government must speak—and the First Amendment does not constrain what it says. It is settled law that "state action that generates or constitutes government speech, rather than private speech, is regarded as outside the purview of the First Amendment to the United States Constitution." (*Delano Farms Co. v. California Table Grape Com.* (2018) 4 Cal.5th 1204, 1222.) "When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says. [Citation.] That freedom in part reflects the fact that it is the democratic electoral process that first and foremost provides a check on government speech. . . . [¶] Were the Free Speech Clause interpreted otherwise, government would not work." (*Walker v. Texas Div., Sons of Confederate Veterans, Inc.* (2015) 576 U.S. 200, 207.)

In a last attempt to avoid dismissal with prejudice, Schmid and Briggs made an evidentiary proffer at the hearing on the demurrer. By that proffer, they represented they were prepared to prove (1) the City Defendants and the ARG Defendants colluded to deprive them of notice of the date and time of the removal work, and (2) the ARG Defendants were allowed to obtain permits for the removal work on an expedited basis, and, once these permits issued, the ARG Defendants failed to wait the required 72 hours before commencing work, all of which would show not only discriminatory animus, but an intent to prevent Schmid and Briggs from expressing their opposition and going to court to obtain immediate injunctive relief.

If added to the complaint by amendment, Schmid and Briggs argued, the above facts would provide a basis to demonstrate concerted activity by the City Defendants and the ARG Defendants and shared intent among all defendants to deprive them of their constitutional rights. The trial court was

34

unpersuaded, as are we. Based on repeated insistence by Schmid and Briggs that they had already alleged enough to support the pleaded claims, the trial court concluded that this evidentiary proffer would have added nothing materially new to the first amended complaint. In denying leave to amend to add these factual allegations, or to include the section 1983 theory appellants contend they had already stated implicitly but wished to add expressly, we cannot say the court abused its discretion.

### III. CONCLUSION AND DISPOSITION

There is considerable irony to the effort Schmid and Briggs have made here to transform what is, at its core, a matter of cultural grievance into a claim of viewpoint discrimination and infringement of their freedom of expression. In doing so, they seem to overlook the fact that, by their participation in the administrative process that led to the removal of "Early Days," along with all others with enough interest in the issue to participate, and by their ongoing, vigorous opposition to the removal of "Early Days" in this case, they are contributing to a robust public debate among San Franciscans about the legacy of the Gold Rush era that can be traced back at least 126 years, as the remarks delivered at the dedication ceremony for the Pioneer Monument in 1894 demonstrate. (See pp. 4–5 & fn. 4, *ante*.)[13]

---

[13] The descriptions of "Early Days" given by Mastick and Farwell at that dedication ceremony track the accepted historical narrative of their time. (See Royce, California: A Study of American Character: From the Conquest in 1846 to the Second Vigilance Committee in San Francisco (2002) pp. 13–15 (A Study of American Character) [in a subchapter titled "Outlines of Older California History"].) But running throughout the same historical narrative is a nativist impulse that was equally well-accepted at the time. (*Id*. at pp. 281–290 [in a subchapter titled "The Warfare against the Foreigners"].) What has changed since 1894 is that, slowly, through the

With their invocation of the demise of the Mendelssohn statue in 1936, Schmid and Briggs look past something even more basic:  There was no independent, impartial judiciary in Nazi Germany to which an objector could turn during those tragic years.  (See Fybel, *When Mass Murder and Theft of All Human Rights Were "Legal": The Nazi Judiciary and Judges* (2012) vol. 25, No. 2, Cal. Litigation 15, 17–18.)  Although these appellants now complain of many forms of error, denial of access to an independent judiciary is not among them, nor could it be.  Indeed, that underscores what may be the greatest irony here.  In the Gold Rush era, our tradition of fair and impartial courts had yet to become fully established,[14] even after the adoption of the Constitution of 1849 and the admission of California to the Union, which were perhaps the signal achievements of the pioneer era.

It seems abundantly clear to us that, while ensuring the Pioneer Monument will continue to stand as a tribute to the pioneers for laying the foundation of the state we now know, the City decided as a policy matter that

years, Californians have begun to acknowledge and renounce this legacy of pioneer era nativism, in no small part due to civic debates like the one that took place in this case.

[14] See A Study of American Character, *supra*, at pages 286–287 ([in a subchapter titled "The Warfare against the Foreigners"] "It was . . . considered safe by an average lynching jury in [the 1850's] to convict a 'greaser' on very moderate evidence if none better could be had.  One could see his guilt so plainly written, we know, in his ugly swarthy face, before the trial began.  Therefore the life of a Spanish American in the mines in the early days, if frequently profitable, was apt to be a little disagreeable.  It served him right, of course.  He had no business, as an alien, to come to the land that God had given us.  And if he was a native Californian, a born 'greaser,' then so much the worse for him.  He was so much more our born foe; we hated his whole degenerate, thieving, landowning, lazy, and discontented race.").

one aspect of the pioneers' founding story—the stain of nativist racism—is no longer worthy of celebration.  If Schmid and Briggs wish to change that policy judgment (it is reversible, after all, because "Early Days" was placed in storage, not shattered to pieces), nothing stops them from utilizing the electoral process as a means to continue advocating for their point of view.

The trial court's ruling sustaining the defendants' demurrer to each cause of action in the first amended complaint and ordering dismissal without leave to amend is affirmed.  Costs shall be awarded to the City Defendants and the ARG Defendants.

STREETER, J.

WE CONCUR:

POLLAK, P. J.
TUCHER, J.

Trial Court: City and County of San Francisco

Trial Judge: Hon. Cynthia Ming-Mei Lee

Counsel:     Law Office of Frear Stephen Schmid and Frear Stephen Schmid
for Plaintiffs and Appellants.

Dennis J. Herrera, City Attorney, Kristen A. Jensen and
Andrea Ruiz-Esquide, Deputy City Attorneys, for Defendants
and Respondents City and County of San Francisco and
Tom DeCaigny.

Donahue Fitzgerald, Andrew S. MacKay and
Holiday Dreessen Powell, for Defendants and Respondents
Atthowe Transportation Co., Inc. and Scott Atthowe.

Smith, Currie & Hancock, Daniel F. McLennon,
Marc L. Sherman, and Matthew Volkmann, for Defendant
and Respondent ARG Conservation Services.

A158861